Roe R. BLACK, Avis C. Black, Roe C. Black, Black Ranches, Inc., a Corporation, Debtor, and Thomas Hart Fisher, Appellants,

v.

DENVER UNITED STATES NATIONAL BANK, Appellee.

No. 17992.

United States Court of Appeals Eighth Circuit.

May 12, 1966.

Motions to Amend and Petition for Rehearing Denied June 21, 1966.

Thomas Hart Fisher, Chicago, Ill., made argument for Roe R. Black, and others and E. H. Powell, Aurora, Neb., filed brief.

Thomas S. Nichols, of Davis, Graham & Stubbs, Denver, Colo., made argument for appellee Denver U. S. National Bank and filed brief with Richard M. Davis, of Davis, Graham & Stubbs, Denver, Colo., and Charles E. Wright, of Cline, Williams, Wright, Johnson, Oldfather & Thompson, Lincoln, Neb.

Before MATTHES and GIBSON, Circuit Judges, and HUNTER, District Judge.

MATTHES, Circuit Judge.

The district court allowed claim No. 32 as a general and unsecured claim in the amount of $7,488.90, representing unpaid interest due Denver United States National Bank, successor to The Denver National Bank (hereinafter sometimes referred to as "Denver Bank"), on the note executed by Roe R. Black and Black Ranches, Inc. on October 19, 1951, in the face amount of $192,-222.68.[1] It stands without contradiction that the amount allowed has not been paid to Denver Bank. Appellants, nevertheless, contend that the payment by "Penny Poke Ranch, Inc., Marlon Brando and Marlon Brando, Jr."[2] of their note to Denver Bank was "a full accord and satisfaction of all moneys due and owing" under Black's note to Denver Bank.

Many of the operative facts have been discussed in our consideration of Marlon Brando, Jr.'s claim No. 21 in appeal No. 17.991, Black et al. v. Brando et al., 8 Cir., 362 F.2d 19 (opinion filed contemporaneously). More particularly, we reviewed: (a) the history of the Black note to Denver Bank for $192,222.68; (b) the execution of the guaranty agreement between Denver Bank and the Brando group; (c) Denver Bank's suit on the agreement; (d) the settlement of the suit by the Brando group giving their note to Denver Bank in the principal amount of $14,372.58; (e) the liquidation of the Brando group note by payment of the full amount, including interest, due thereon.

The circumstances attending the payment to Denver Bank of the Brando note

1. Hereinafter we shall refer to Black and Black Ranches, Inc. collectively as "Black" and Black Ranches, Inc. as "Black Ranches" or "debtor corporation."

2. Hereinafter we shall sometimes refer to Penny Poke Ranch, Inc., Marlon Brando, and Marlon Brando, Jr. as the "Brando group".

are important. The face amount of $14,-372.58 and accrued interest of $315.60 (total, $14,688.18) was paid in two installments: on March 1, 1956, in the amount of $7,391.29, and on May 3, 1956, in the amount of $7,296.89. Denver Bank's ledger sheet for "Borrower Black Ranches, Inc." shows that the first installment was applied toward payment of the unpaid principal on the Black note and that, after such payment, there remained a balance due on the principal of $1,162.10. The second installment was applied toward payment of the balance of the principal of the Black note ($1,-162.10) and $6,134.71 of the interest due thereon. There appears upon the ledger sheet, on the same line of the entry showing the last payment, the words "Settlement in full". The words "Total Liability" appear in the last column of the printed form of the ledger sheet. Under these words and on the line reflecting the entry of the last payment, there appears ".00".

The entries of September 22, 1955 on the Black Ranches ledger sheet should also be noticed. The first entry is "Charged to P and L on This Day" the amount of $8,553.39, this being the balance of the principal due at that time on the Black note. Under the "Total Liability" column appears ".00". The second September 22, 1955 entry reflects that the same amount was debited to Black Ranches' account so that after the second entry the ledger sheet reflected that there still remained a balance due on the principal of $8,553.39.

It also stands undisputed that upon payment by Brandos of the balance due on the principal of the Black note, Denver Bank placed this stamp on the face of the note:

May 3, 1956
D N B
Discount

and delivered the note to Marlon Brando. As shown in our opinion in No. 17,991, this note formed the basis of Brando, Jr.'s claim No. 21.

Appellants do not suggest the existence of any direct evidence to prove their theory. They rely, however, upon the circumstances and argue, in effect, that the only logical inference that may be drawn from the circumstantial evidence is that the parties intended that the payment by the Brando group would constitute full satisfaction of debtor's obligation to Denver Bank.

Appellants mistakenly assert that Judge Delehant "totally ignored" the accord and satisfaction issue. The Judge came to grips with this question in his memorandum opinion (pages 171 through 173) of the printed record in this language:

"Similarly, upon factual bases, the court has announced its finding of the want of support for the objections to the allowance, in whole or in part, of the claim".

The Judge then summarized paragraphs 1 and 2 of the objections in which it was alleged that Denver Bank knew that the Black promissory note had been executed as an accommodation for Marlon Brando, Jr. and others in connection with the financing and purchase of the cattle owned by Marlon Brando, Jr. Paragraph 3 of the objections was disposed of by Judge Delehant as follows:

"The payment and satisfaction in full of the obligation asserted in Proof of Claim No. 32. (In this connection, the court has had constantly in view a position of the objectors, not strictly pleaded, but advanced in their briefs, that the stamped impression of the word, DISCOUNT, supra, upon the note on the payment of the balance of its principal sum, is to be interpreted in such wise as to amount to a release or abandonment of any actual deficiency in the payment of interest. That position is incorrect, honestly enough, perhaps, but incorrect, neverless. The use of the word DISCOUNT was and is a device to identify the department of the bank through which that transaction was cleared. It had and has no connotation of forgiveness. The evidence conclusively so shows,

even without resort to the judicial awareness that such indulgence is not a common practice in the banking fraternity.)"

The Judge noted that, in paragraph 5, the objectors asserted that, upon the payment of the Brando note, the Denver Bank satisfied all obligations of Black Ranches, Inc.

In this court, appellants rely upon Restatement of Contracts, § 421, and cases which stand for the proposition that a payment by a third person can result in an accord and satisfaction.

Section 421 of Restatement provides, in pertinent part:

"A payment or other performance by a third person, *accepted by a creditor as full or partial satisfaction of his claim*, discharges the debtor's duty in accordance with the terms on which the third person offered it." (Emphasis supplied).

Tarascio v. Mancuso, 141 Neb. 225, 3 N.W.2d 400 (1942) and Murphy v. Omaha Loan & Building Ass'n, 141 Neb. 230, 3 N.W.2d 403 (1942) cite with approval the foregoing section of Restatement. Cf. also, Grouf v. State National Bank of St. Louis, 76 F.2d 726 (8 Cir. 1935); Moers v. Moers, 229 N.Y. 294, 128 N.E. 202, 14 A.L.R. 225 (1920). The key element of accord and satisfaction is the intention of the parties, which as a rule presents a question of fact. But it becomes a question of law if the evidence, directly or through reasonable inferences, creates no conflict as to intention. See, Pitts v. National Ind. Fisheries Co., 71 Colo. 316, 206 P. 571, 34 A.L.R. 1033 (1922); Pring v. Udall, 95 Colo. 23, 31 P.2d 1113 (1934); Swanson v. United-Greenfield Corporation, 239 F.Supp. 299, 305 (D.Ct. Conn.1965).

We are not inclined to believe that the evidence establishes, as a matter of law, that the parties intended that the payment to Denver Bank of the Brando note was to operate as full satisfaction of the Black note. To be sure, the records of the bank and its failure to retain the Black note in its possession are circum-stances which lend vitality to appellants' position. However, there are additional facts which the trial court was entitled to, and did, consider in resolving the accord and satisfaction issue. A representative of the bank testified that the "Total Liability" column as a whole, and the figures ".00", in particular, appearing as a part of the entry on the ledger sheet of May 3, 1956 referred solely to the principal of the note and not the interest. That is, the ".00" entry meant that only the principal of the note had been fully paid. The witness also explained that "May 3 D N B DISCOUNT" appearing on the note merely identified the department of Denver Bank responsible for the mechanical handling of the transaction. This witness further testified that the entries on September 22, 1955, indicating that the balance due on the principal had been charged to profit and loss, were made as a part of normal bookkeeping procedures to reflect a decision of Denver Bank's board of directors complying with the requirement of the bank examiner that the loan be transferred to the inactive ledger. This requirement was implemented by posting the item off the ledger and then posting it back on the ledger on the same day.

Appellants forcefully argue that the delivery of the Black note to the Brando group for an amount less than the amount still due on the note "not only released Penny Poke and the Brandos from all further liability under their written guaranty of Debtor's note, but furnished still further written evidence of Denver's intentional cancellation and express renunciation of its rights as holder of Debtor's note, under Sections 119, 120 and 122 of the Negotiable Instruments Law." Certainly the delivery of the note is *evidence* of an intent to cancel, but it is not *conclusive* of that question. Judge Delehant, being aware of this circumstance, found that "[s]uch delivery was made to enable Marlon Brando, Marlon Brando, Jr. and Penny Poke Ranch, Inc., or any of them, to make any proper use of the note in the course of their dealings with Roe R.

Black and Black Ranches, Inc., or either of them".

We have examined the sections of the Uniform Negotiable Instruments Act relied upon by appellants.[3] In summary, these sections enumerate acts which will operate: (a) to discharge a negotiable instrument (§ 119); (b) to discharge a person secondarily liable (§ 120); (c) for renunciation of the holder's rights against any party to the instrument (§ 122). The applicability of the provisions of NIA must, of necessity, rest upon the controlling facts. Upon this record we find no basis for applying the cited sections of NIA.

■ The legal relationship of debtor corporation and the Brandos to Denver Bank at the time the Brando payment was made is an important factor. If, as appellants argue, the Brandos were primarily liable and debtor corporation was secondarily liable to the bank, a different result probably would ensue. But that issue was decided adversely to appellants in disposition of Brando, Jr.'s claim No. 21. See opinion filed contemporaneously in appeal No. 17,991, Black et al. v. Brando et al., 8 Cir., 362 F.2d 19. The additional arguments advanced by appellants are not persuasive. We adhere to the view that Judge Delehant correctly determined that debtor corporation was the primary obligor, as maker, of the Black note to Denver Bank and the Brandos were liable only as guarantors by virtue of the guaranty agreement.

■ Appellants also question the validity of the allowance on the assumption that Cobbey and Brando had concocted a fraudulent scheme to take over debtor's ranch property. They project this notion by asserting that Denver Bank "was a direct participant in the Brando-Cobbey fraudulent 'project' ". There is not a scintilla of direct evidence to prove that Denver Bank was guilty of any misdeeds or wrongdoing. Neither do the circumstances support an inference of that nature. This contention was not espoused below. It should not have been raised in this court.

Neither is there substance in appellants' final contention that the court erred in failing to hold that the guaranty agreement between Denver Bank and the Brando group "was a third-party contract * * * for the benefit of Debtor as the third-party beneficiary, which contract could not be terminated without Debtor's consent which was never given, and therefore such contract precludes Denver's right to assert its claim No. 32 against Debtor, and thus deprive Debtor of its benefits thereunder".

■ From what has been said above and in our opinion in No. 17,991, the answer is obvious. The "Guaranty Agreement" was precisely what those words connote. Ostensibly the agreement constituted a guaranty by the Brando group to pay the Black note to Denver Bank in the event Black and debtor corporation, the makers and primary holders, failed to discharge their obligation. Nothing appears to require or, for that matter, justify interpreting the document as a third-party contract. Judge Delehant ruled this contention against appellants. His holding was right and we concur therein.

In summary, we are left with the impression that appellants' basic contention and their supporting arguments are "primarily grist for the trier of fact and not for us as a reviewing court". A careful study of the record convincingly demonstrates that Judge Delehant's findings of fact are not clearly erroneous and were not induced by a misconception of the law. The order appealed from is affirmed.

By way of addendum, we accord recognition to Judge Delehant's untiring patience, understanding attitude and judi-

---

3. The Uniform Negotiable Instruments Act has been adopted in Nebraska and Colorado. Neb.Rev.Stat. §§ 62–101 to 62–1,195; Colo.Rev.Stat. §§ 95–1–1 to 95–4–

7. Since the sections of the Colorado and Nebraska statutes cited here are *similar* to the NIA sections, we shall cite the NIA.

cial fairness, demonstrated throughout this unduly protracted litigation. Judge Delehant maintained poise and restraint and exhibited commendable judicial temperament throughout the long ordeal of the numerous hearings. It is quite evident that the Judge, through a painstaking analysis and study of the evidence, was able to comprehend the entangled financial affairs of the debtor corporation. His adjudication of the rights of the creditors who are parties to the various appeals meets with our full approval.

The voluminous original files and printed record attest to the time-consuming task of considering and disposing of not only the claims, but sundry other matters. The fact remains, however, that this proceeding was instituted nearly twelve years ago. When our decisions become final, we trust that a plan or plans for reorganization will be timely filed and acted upon, or that other appropriate action will be pursued to bring this proceeding to a conclusion.