McLAIN PLUMBING & ELECTRICAL SERVICE, INC., and John F. McLain, a Joint Venture

v.

The UNITED STATES.

No. 689–89C.

United States Court of Federal Claims.

Nov. 19, 1993.

John C. McManus, Decatur, GA, for plaintiff.

Phyllis Jo Baunach, Washington, DC, with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant; Mary E. Barrett, Dept. of Veteran Affairs, of counsel.

## OPINION

YOCK, Judge.

This Government contract case comes before this Court on the parties' cross-motions for summary judgement. The plaintiff, McLain Plumbing & Electrical Service, Inc. and John F. McLain, A Joint Venture, claims that the Government improperly ordered the default termination of a subcontractor during the performance of a contract for the conversion and upgrading of the energy management system at the Veterans Administration Medical Center in Jackson, Mississippi. After the defaulted subcontractor subsequently prevailed against the plaintiff in a contract arbitration proceeding for improper default termination, the plaintiff filed suit in this Court for recovery of the arbitration sum awarded, plus the costs for subcontractor reprocurement as well as for the additional expenses of contract administration.

For the reasons discussed herein, this Court denies the plaintiff's motion for sum-

mary judgment and grants the defendant's cross-motion for summary judgment.

### Factual Background

This dispute involves the replacement of the energy management system at the Veterans Administration Medical Center (Center) in Jackson, Mississippi. The energy management system at the Center controls the temperature and humidity throughout the hospital complex. In addition to general atmospheric regulation, the system also monitors temperatures in the most important regions of the medical center, including the surgery rooms and intensive care units that require specific thermally controlled conditions for proper diagnosis and treatment. In addition, the system also controls the research facilities that house animals and specimens that also require specific thermally controlled conditions for proper laboratory operation. Thus, when the system technology became dated and obsolete, the Center required an upgrading of the energy management system without affecting the ongoing administration of the hospital and research facilities. Accordingly, in a solicitation containing specific performance and completion requirements, the Center issued an invitation for bids on or about June 17, 1987.

On September 30, 1987, the Veterans Administration (VA) awarded Contract No. V586C–374, Project No. 85–115 (VA contract) for the conversion and upgrade of the energy management system to McLain Plumbing & Electrical Service, Inc. and John F. McLain, A Joint Venture (McLain) for a contract price of $188,000.[1] Shortly after contract award, McLain subcontracted virtually the entire project. For the bulk of the contract, McLain subcontracted with Ergon Systems, Inc. (ESI), the installer of the original energy management system at the Center. As for the electrical work, McLain subcontracted to Everett Electric. Ironically, as noted by the defendant, the Center had experienced problems with the existing energy management system since the initial installation by ESI. In fact, as admitted by the plaintiff, ESI had never solved all of the problems required by the warranties on the various components of the original system. Indeed, in the instant proceeding, only the alleged inadequate and untimely work of ESI appears to constitute the basis for the administrative and performance issues of concern in this case. Nevertheless, as the primary contractor, McLain alone faced the legal issues involving contractual performance as ESI was only a subcontractor.

As set forth in the specifications, the VA contract involved the replacement of the old energy management system at the Center. The VA contract required the installation of two microprocessor computers, connected to twenty-seven field processing units, which in turn surveyed seventy-two temperature sensors throughout the facility. The VA contract also required the purchase of the requisite computer hardware and software as well as the installation of the necessary wiring and cables and other miscellaneous electrical equipment. As for the computer hardware, the contract set out the requirements with the minimum specifications required for the systems (e.g., IBM Model 60 computer or equivalent, thirteen-inch color monitor, VGA graphics card), components (e.g., 240 cps dot-matrix printers), and accessories (e.g., computer desks, chairs). As for the computer software, the VA contract mandated the development of a multi-user graphics operation system with specific aesthetic and functional capabilities. For almost all of these technical requirements, however, the VA contract required preauthorization by technical submittals describing the items to be utilized in the performance of the VA contract.

On October 21, 1987, representatives of the Veterans Administration (VA) conducted a preconstruction conference with McLain and ESI, with the VA's consultant, Deas, Eldridge, & Associates, P.A. (Deas),[2] also in

---

1. In addition to McLain, two other bidders responded to the solicitation: G.H. Avery Co. (Andover Primeco) submitted an offer of $255,604, and Johnson Controls submitted an offer of $669,175.

2. To accommodate the most advantageous and timely energy management system conversion and upgrade, the Center contracted with this mechanical and electrical engineering firm to provide consulting services throughout the anticipated project. Deas assisted in the drafting of

attendance. At the conference, the VA emphasized the administrative requirements of the VA contract, including the requirement of the submission of a cost breakdown, a time chart, a list of subcontractors, the name of the superintendent of the worksite, as well as other technical submittals. Further, the VA also reiterated the requirement of completion within the 180–day timeframe. McLain and ESI confirmed that there would be no problems with specification compliance and that they could complete the contract within the 180–day timeframe. Thereafter, on November 2, 1987, the VA issued the notice to proceed, with the completion date set for May 2, 1988.

As soon as December 1, 1987, however, the VA issued the first of a series of cure notices for the contractor's failure to submit the technical information required by the administrative requirements of the VA contract. Subsequently, on December 11, 1987, McLain submitted some of the materials, including a bar graph of performance milestones showing 100 percent completion by April 8, 1988. Nevertheless, on December 28, 1987, the VA requested further clarification and documentation regarding the materials, citing at least nineteen submission deficiencies. For these reasons, on January 12, 1988, the VA issued a second cure notice. Because of the continuing delays, on January 13, 1988, the VA met with McLain and ESI to discuss the causes for the submission deficiencies. At the meeting, ESI expressed objections to some of the specifications and contended that some of the computer requirements contemplated the purchase (or use) of proprietary equipment not originally contemplated by the plaintiffs. Subsequently, on January 14, 1988, the VA denied the plaintiff's charge pertaining to the proprietary nature of the computer equipment. Deas also notified McLain of three manufacturers that would be acceptable under the specifications of the contract for the computer equipment in question. Nevertheless, on January 20, 1988, the

VA issued yet another cure notice for the still missing technical submittals. In this third cure notice, the VA required submission of the outstanding information by February 1, 1988. On February 9, 1988, McLain submitted the requested technical submittals.

After the eventual approval of the technical submissions and the resolution of the procedural difficulties, the problems turned from the administrative requirements to performance requirements. On March 24, 1988, Deas prepared a report citing ten such performance deficiencies in the new energy management system. Accordingly, on March 25, 1988, the VA held another meeting with McLain and ESI, with Deas in attendance, to address the deficiencies. Again, on March 29, 1988, Deas discovered and detailed another twenty-four performance deficiencies. On April 5, 1988, the VA again held another meeting with McLain and ESI, with Deas in attendance, to address these reoccurring and supplemental deficiencies. During the remainder of the month, the VA and Deas continued to monitor the performance of ESI and continued to point out performance deficiencies both to ESI and McLain. Finally, on April 18, 1988, the VA dispatched a fourth cure notice. The notice stated:

> It does not appear likely that contract work can be completed by May 2, 1988, *in accordance with contract specifications.* If this is the case, the government may elect to terminate for default or consider any recovery schedule which you might present; that is, allow contract work to continue under a reviewed completion schedule. In order to implement this alternative, however, the government must receive consideration.

Letter from Cheryl D. Hannon, Contracting Officer, VA Contract, to McLain Plumbing & Electrical Service, Inc. (April 18, 1988).

Despite these numerous performance difficulties, until the middle of April 1988, both

the specifications, the preparation of the costs estimates, the estimation of the time schedule, and also in supervising the performance of the contractor during the conversion and upgrade process. Consequently, in order to ensure the most unobtrusive and efficient conversion possible, Deas delineated a specific milestone schedule for each stage of performance as well as for the final date of completion. For the entire energy management system conversion and upgrade, Deas had estimated a 180–day period for completion. The VA had adopted these recommendations in the specifications of the VA contract.

the VA and McLain apparently anticipated contract completion by the scheduled completion date. On April 20, 1988, however, all expectations of timely performance ceased. On this day, just fifteen days from the scheduled completion date of May 2, 1988, ESI tested the first of the remote panels. The test of the panel installed by ESI under the VA contract proved unsuccessful and, at one point, even rendered the central computer inoperable. Following this test, on April 25, 1988, McLain requested a thirty-day extension for the completion of the contract. Significantly, as of April 28, 1988, ESI had completed only between fifty and sixty percent of the contract, although ESI and McLain had guaranteed ninety-nine percent completion by that date. In a written request dated April 28, 1988, moreover, McLain enlarged the length of the extension request, seeking a forty-one day continuation for the completion of the contract. Additionally, McLain also requested that the VA allow substantial completion without the installation of the graphics package for the software component of the energy management system specifically called for by the specifications.

Not surprisingly, on the scheduled completion date of May 2, 1988, the VA contract had been only partially completed. Although the installation of the electrical equipment, sensor implements, and the computer hardware had been substantially completed, the computer software still contained significant operational deficiencies. Further, of the twenty-six field panels delivered to the site and "roughed in," only one had been installed, and this panel functioned improperly. In all, the VA cited eight specific deficiencies which persisted in the energy management system. Accordingly, on May 3, 1988, the contracting officer for the VA contract placed McLain in default and ordered all work to stop.

Thereafter, however, the VA granted authorization for McLain to develop a plan to cure the default. In a conference on May 3, 1988, the VA further provided instructions to McLain on the development of a recovery schedule. At the conference, the VA and McLain also discussed the performance of the primary subcontractor, ESI. By general consensus, both the VA and McLain, as well as Deas, agreed that ESI was not capable of completing the contract, irrespective of any time extension. As a result, the contracting parties orally agreed upon the replacement of ESI as the subcontractor. On May 10, 1988, the contracting officer for the VA confirmed in writing that, if McLain selected another subcontractor, that the VA would allow an extension of time pursuant to a negotiated recovery schedule. The letter stated in pertinent part:

Reference is made to contract no. V586C–374 to Replace/Update Energy Management System Computer at this VA Medical Center.

You have failed to perform in accordance with specifications by the specified completion time and there are no excusable delays. The Government is entitled to insist on strict compliance with all contract provisions.

The following specifications are not being met:

\* \* \* \* \* \*

The right to cure deficiencies exists only if corrections can be made within a reasonable time. Based on past performance, the Government has reason to doubt that specifications can be met and contract work completed under a revised contract schedule.

However, as an alternative to default, the Government may permit you to continue performance of the contract by means of a new subcontractor under a recovery schedule, provided the rights of the Government are adequately preserved. Your recovery schedule should be forwarded to my office no later than *May 17, 1988* for consideration.

Letter from Cheryl D. Hannon, Contracting Officer, VA Contract, to McLain Plumbing & Electrical Service, Inc. (May 10, 1988). Accepting the alternative to default provided by the VA, McLain terminated the subcontract with ESI on May 16, 1988.

Thereafter, on May 19, 1988, the VA met with McLain and described the requirements of a recovery schedule. Consequently, on May 23, 1988, McLain submitted a recovery

proposal, suggesting that the new subcontractor for the project would be Mississippi Controls, with a completion period of seven months. Accepting the terms of the proposal without amendment, the VA granted McLain an additional 180 days for performance, or until November 18, 1988. In a written agreement reciting the above described terms, the VA and McLain executed contract modification number T/E "1" on July 29, 1988. Duly signed and executed by John F. McLain, President of McLain Plumbing & Electrical Service, Inc., and by Georgie P. Broadhead, Contracting Officer for the modified VA contract, modification number T/E "1" recited:

> The Contractor satisfactorily performed the electrical portion of the required work. However, the subcontractor for the computer hardware and software could not meet contract specifications and the contract period expired on May 2, 1988, without successful demonstration of the energy management system. McLain requested they be allowed to complete the contract with another subcontractor. As consideration for the time extension [McLain proposes] the offered extended maintenance of the present energy management system and to pay the cost of additional A/E services required.

Amendment of Solicitation/Modification of Contract, Amendment/Modification No. T/E "1" (September 30, 1988). Pursuant to this modification, McLain completed the VA contract in November of 1988. In fact, the defendant even referenced the "smooth" completion of the modified contract with the new subcontractor, Mississippi Controls.

Following the plaintiff's termination of ESI for default on or about May 16, 1988, ESI had filed a demand for arbitration with the American Arbitration Association against McLain. After a hearing conducted on January 18–19, 1989, a panel of three arbitrators ruled in favor of ESI, granting ESI an award in the amount of some $143,700. The arbiters found that McLain had improperly terminated the subcontract with ESI for default. McLain ended up paying this amount to ESI on or about April 17, 1989. Subsequently, on July 7, 1989, McLain submitted a claim to the contracting officer for the VA contract for an equitable adjustment for recovery of the arbitration award plus additional costs and expenses. On December 15, 1989, the contracting officer issued a final decision denying any such claim. Thereafter, the plaintiff filed its complaint in this Court on December 21, 1989, seeking recovery of the award plus costs and expenses totaling some $286,157.74.

In its complaint, the plaintiff asserts the liability of the United States for the arbitration award that resulted from the termination for default of ESI. The plaintiff claims that the VA "forced" the termination of the plaintiff's subcontractor. As such, the plaintiff posits that the main issue involves whether the VA improperly conditioned the continued performance of the VA contract on the termination and replacement of the plaintiff's subcontractor. By this act, the plaintiff theorizes that the VA improperly ordered a change in the terms of the contract. Then, in a series of scattershot legal theories, the plaintiff attempts to find legal support for the alleged change:

> Whether the actions of the government are characterized as a Change to the contract, a constructive change to the contract, a breach of the government's duty not to interfere or hinder the performance of the work, or a misinterpretation or misapplication of specifications that is tantamount to a change in the specifications, McLain is entitled to recover the costs associated with complying with the contracting officer's directive to obtain a new subcontractor.

Complaint, Appendix B, at 8 (citing Administrative Claim from McLain Plumbing & Electrical Service, Inc., to Georgie Broadhead, Contracting Officer for the modified VA contract (undated)). In sum, albeit by an analytical merry-go-round, the plaintiff seeks to hold the United States liable for an arbitration award rendered against the plaintiff, in a proceeding in which the United States neither participated nor maintained representation.

In the answer to the complaint, in addition to generally denying any basis for a claim of recovery against the United States, the de-

fendant proffered the affirmative defense of accord and satisfaction. Therein, the defendant contends:

> Plaintiff's claim is barred by accord and satisfaction, in that on or about July 29, 1988, plaintiff entered into a supplemental agreement with the VA granting plaintiff a time extension to complete the contract. Incorporated into this agreement was plaintiff's decision to complete the contract with another subcontractor. Plaintiff abandoned and failed to reserve any rights to file any claim arising out of its retention of a replacement subcontractor under the supplemental agreement.

Answer, at 4. Therefore, based upon this affirmative defense, the defendant asserts the discharge of all the claims asserted by the plaintiff.

On April 7, 1992, the plaintiff filed the current motion for summary judgment. The plaintiff therein reiterates the bases of recovery as asserted in the complaint, and again claims that the VA improperly compelled the termination and replacement of ESI on the VA contract. To demonstrate this alleged wrongful action, however, the plaintiff provides a more defined argument. Specifically, the plaintiff points to the finding of the arbitration proceeding between the plaintiff and ESI: "The ruling of the arbitrators establishes that the government's interpretation of the specifications and its determination that ESI's work did not meet specifications was *in error.*" Plaintiff's Motion for Summary Judgment, at 10. The plaintiff argues that the error established by the arbitrators represented the basis for the change in the terms of the contract. Thus, if the VA required substituted performance in error, the plaintiff contends that a change occurred: "By forcing the termination of the subcontractor, ESI, the government dramatically altered the method and the manner with which McLain could perform its work and that change resulted in significant costs to McLain." *Id.* Further, in response to the defendant's assertion of discharge by accord and satisfaction pursuant to the plaintiff's subsequent agreement to complete the contract with another subcontractor, the plaintiff argues that, by providing the alternative of securing a new subcontractor or default termination, the United States coerced the desired result. As such, the plaintiff suggests economic duress as a defense to the Government's accord and satisfaction theory.

On July 23, 1992, the defendant filed its opposition to the plaintiff's motion for summary judgment and its own cross-motion for summary judgment. In that motion, the defendant presents three legal arguments to refute the plaintiff's case. First, the defendant argues that the plaintiff's claim, based upon costs incurred because its initial subcontractor was terminated, is barred by the doctrine of accord and satisfaction. Second, the defendant contends that the plaintiff submitted the instant claim in an untimely manner under the Changes clause of the VA contract. Third and finally, the defendant asserts that even if the plaintiff's claim is not barred by either one or both of its first two arguments, the plaintiff nevertheless has failed to establish entitlement to an equitable adjustment on the merits.

██ Despite the myriad of legal theories presented by the plaintiff, and the various defenses cited by the defendant, this Court finds that resolution of this case is determined under the principles that underlie the doctrine of accord and satisfaction. Indeed, absent an express reservation of rights by the plaintiff, an accord and satisfaction acts to discharge the claims relative to the rights and obligations assumed under the substituted agreement. In such an event, as in the circumstances of the case here, the plaintiff would lose the right to sue the United States for claims based on actions predating the execution of the modification at issue. This Court finds such a result here.

*Discussion*

Summary judgment is appropriate only when a court determines that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. RCFC 56(c). Thus, summary judgement is appropriate here if the Government carries the burden of showing that (1) there is no genuine issue of material fact and that (2) it is entitled to judgment as a matter of law. *Adickes v. S.H. Kress &*

*Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

When making a summary judgment determination, a court first discovers the existence of a genuine issue as to any material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). While the movant bears the initial burden of showing the absence of all genuine issues of material fact, *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 622 n. 18, 93 S.Ct. 2469, 2479 n. 18, 37 L.Ed.2d 207 (1973), the burden on the moving party may be discharged by showing either the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the movant discharges this burden, the burden falls on the nonmovant to demonstrate specific facts showing a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). However, as the parties in the instant dispute seek cross-motions for summary judgment, this Court finds an absence of any dispute over matters of material fact by implied stipulation where neither party challenges such. *Messerschmidt v. United States,* 29 Fed.Cl. 1, 14–15 (1993). Thus, in the factual circumstances here present, this Court finds no issue of material fact, because "where both parties have filed dispositive motions, and neither has challenged nor denied the material facts relied upon by the other, the trial court may properly enter judgment on the issue of law, based upon the material facts contained in the motions." *Heinemann v. United States,* 796 F.2d 451, 456 (Fed.Cir.1986), *cert. denied,* 480 U.S. 930, 107 S.Ct. 1565, 94 L.Ed.2d 758 (1987). Accordingly, this Court finds no genuine issue of material fact.

When making a summary judgment determination, however, a court must also consider whether the movant is entitled to a judgment as a matter of law. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552. As inferred above, this Court finds resolution of all the issues of the dispute at bar by reference to discharge by accord and satisfaction. Accordingly, if present, the sole question of law involves the application of this affirmative defense.

*Discharge by Accord and Satisfaction*

The defendant here alleges that no liability exists as to any rights or obligations under the original VA contract as the parties agreed to a modification of the contract with the substitution of new performance by a new subcontractor. Pursuant to this modification, the defendant asserts a *discharge* of the original VA contract by accord and satisfaction. In contrast, the plaintiff argues against this affirmative defense since the modification contained no release of claims regarding the original contract.

Discharge implicates the extinguishment of all or some rights or obligations under a contract. 5A Arthur L. Corbin, Corbin on Contracts § 1228, at 507 (1964). In Government contracting, discharge generally takes place either by final payment, mutual agreement and rescission, or by contract modification. John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 923 (2d ed. 1986) (hereinafter Administration of Government Contracts). Further, discharge by contract modification occurs either by accord and satisfaction or by release. *Id.* at 928–35. In contrast to this clear delineation regarding the methods of discharge, the plaintiff confuses the discharge of contractual rights and obligations by release and the discharge of contractual rights and obligations by accord and satisfaction.

Albeit commonly confused,[3] discharge by release and discharge by accord

---

**3.** Defining an accord and satisfaction as "settlement," the following illustration demonstrates the confusion over the dichotomy between a discharge by release and a discharge by accord and satisfaction:

> The defense of "settlement" is separate and distinct from that of "release." At times, how-

ever, a settlement discharging a Govt contract claim is improperly called a release (or visa versa)—and the problem is further confused by the fact that a "settlement" document may often use "release"-type language. * * * As a result, there has been an unfortunate tendency in the Govt contract legal decisions to confuse

and satisfaction implicate different theories. The discharge of a claim by accord and satisfaction involves an accord by bilateral agreement among the contracting parties, and discharge occurs only after the satisfaction of an additional or alternative performance. *Valcon II, Inc. v. United States,* 26 Cl.Cl. 393, 397 (1992). In contrast, the discharge of a claim by release generally involves a unilateral act, whereby a party immediately disclaims a contract right or obligation. *Adler Constr. Co. v. United States,* 191 Ct.Cl. 607, 613, 423 F.2d 1362, 1365 (1970), *cert. denied,* 400 U.S. 993, 91 S.Ct. 461, 27 L.Ed.2d 441 (1971). Despite the distinction, when contracting parties execute an accord and satisfaction which also contains an express release, courts frequently recognize the discharge by release and ignore any issue of discharge by accord and satisfaction; in other more limited situations, courts have even used the words discharge and release interchangeably. Unfortunately, the resulting confusion has led some to believe, as does the plaintiff here, that a release constitutes a prerequisite of a valid discharge by accord and satisfaction. To the contrary, while an accord and satisfaction *may* contain an express release for the immediate discharge of a contractual right or obligation, a release constitutes no condition precedent to discharge by accord and satisfaction. *See Tri-O, Inc. v. United States,* 28 Fed.Cl. 463, 470–71 (1993) (applying disparate analyses for the discharge of claims by release with the discharge of claims by accord and satisfaction). In fact, the mere existence of an accord implies the discharge upon satisfaction, although, of course, the presence and scope of any such discharge by accord and satisfaction depends upon the facts and circumstances of the particular case. Here, the issue does not involve whether the parties agreed to a discharge of rights by release alone or by an "express release" accompanying an accord and satisfaction, but whether the parties agreed to the discharge of rights solely pursuant to an accord and satisfaction.

Commonly, in Government contracts, an accord and satisfaction constitutes a new and different contract that operates to terminate an existing contract. *Kuehne & Nagel, Inc. v. United States,* 17 Cl.Ct. 11, 15 (1989). In general, however, an accord and satisfaction discharges the contractual rights or obligations that results by the rendering of additional or alternative performance and the acceptance of such performance as satisfaction of said rights or obligations. *Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1581 (Fed.Cir.1993); *Emerson–Sack–Warner Corp. v. United States,* 189 Ct.Cl. 264, 277, 416 F.2d 1335, 1343 (1969); *T.L. Roof & Assocs. Constr. Co. v. United States,* 28 Fed.Cl. 572, 576 n. 4 (1993). An accord incorporates the agreement to render additional or alternative performance in fulfillment of a contractual right or obligation. *Spirit Leveling Contractors v. United States,* 19 Cl.Ct. 84, 92 (1989). A satisfaction thus comprises the execution of the performance. *John Massman Contracting Co. v. United States,* 23 Cl.Ct. 24, 29 (1991). Therefore, upon full execution of the performance, an accord and satisfaction occurs. *Chesapeake & Potomac Tel. Co. v. United States,* 228 Ct.Cl. 101, 108, 654 F.2d 711, 716 (1981). Consequently, upon the completion of an accord and satisfaction, discharge results to terminate the previous rights or obligations, or in some cases, the previous contract in whole. *See, e.g., XXX Constr. Co. v. United States,* 16 Cl.Ct. 491, 499 (1989); *King Fisher Marine Serv., Inc. v. United States,* 16 Cl.Ct. 231, 236 (1989).

As it does in this case, a claim of discharge by accord and satisfaction generally arises as an affirmative defense. J. RICHARD MARGULIES, *DELAYS, SUSPENSION OF WORK, AND ACCELERATION, IN* CONSTRUCTION CONTRACTING 617, 675 (George Washington University 1991). "Accord and satisfaction is a defensive action, and, if successfully established, will be an absolute bar to any claim coming within the scope of the accord." 6 JOHN C. MCBRIDE ET AL., GOVERNMENT CONTRACTS § 40.10[1], at 40–3 (1993). Further, "[s]ince

the essentially *bilateral* nature of a *settlement* with the essentially *unilateral* nature of a *release.* Indeed, some tribunals have mistakenly equated the two.

Carl L. Vacketta, *Settlement & Release, in* No. 80–6, THE GOVERNMENT CONTRACT BRIEFING PAPERS 165, 166 (Dec.1980) (footnotes omitted).

a plea of accord and satisfaction is a plea in bar in favor of the pleading party, it precludes any further continuation of the litigation if successfully established." *Id.* § 40.10, at 40–1. Indeed, in a situation where a party seeks to assert a claim pursuant to a right or obligation precedent to an accord, the United States Claims Court, this Court's predecessor, has noted that accord and satisfaction confers the perfect defense. *See Commercial Contractors, Inc. v. United States*, 25 Cl.Ct. 666, 669 (1992) (" 'Accord and satisfaction' * * * provides a perfect defense in an action for enforcement of a previous claim, whether that claim was well founded or not."). Resultingly, as this Court noted above, if the defendant demonstrates an accord and satisfaction pertaining to the original VA contract, the plaintiff would lose the right to sue the Government for claims based upon the prior contract on the grounds of discharge. Accordingly, this Court considers first the presence of and, then if applicable, the scope of any accord and satisfaction.

 To invoke the existence of an accord and satisfaction, the pleading party bears the burden of proving that a modification to the Government contract constitutes an accord and that a subsequent performance constitutes the satisfaction. *McDonald v. United States*, 13 Cl.Ct. 255, 259–60 (1987). To demonstrate such, the courts have established the following prerequisites for a showing of accord and satisfaction: (1) proper subject matter, (2) competent parties, (3) a meeting of the minds, and (4) consideration. *Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 58–59, 343 F.2d 951, 955 (1965) (quoting *Navada Half Moon Mining Co. v. Combined Metals Reduction Co.*, 176 F.2d 73, 76 (10th Cir.1949)); *Spalding and Son, Inc. v. United States*, 24 Cl.Ct. 112, 154 (1991). The absence of any of these elements results in a failure of the defense. *Westerhold v. United States*, 28 Fed.Cl. 172, 175 (1993). As for proper subject matter and competent parties, the plaintiff here stipulates to these elements of an accord and satisfaction. Plaintiff's Response, at 3. Instead, the plaintiff challenges only the existence of a "meeting of the minds" and of consideration. To ascertain the presence of

these elements, this Court reviews the facts surrounding the purported accord.

 As referenced in the above factual recitation, on May 3, 1988, the contracting officer for the VA contract placed the plaintiff in default. At the same time, the defendant offered to consider a modification to the VA contract. Then, several days later, the defendant reaffirmed the proffer provided that the plaintiff replaced the primary subcontractor. By these actions, the defendant submitted an invitation for an offer of an accord. On May 23, 1988, the plaintiff submitted an offer of an accord in the form of a recovery schedule. Therein, after reciting the milestone schedule for the performance and completion of the substituted performance, the plaintiff recited:

> McLain agrees to complete the referenced Project according to the above schedule with the understanding that the original contract price of $188,000.00 remains the same. McLain understands that it will be responsible for extended maintenance costs of the present system, said costs estimated in a range of 45,000.00 to $8,000.00. Additionally, McLain understands that it will be responsible for additional costs incurred by V.A. in connection with the amended A/E contract consisting of construction period services in the approximate amount of $2,305.77 and site visits in the range of $1,452.34 calculated at the rate of $181.54 per required site visit. The above costs to be absorbed by McLain are in consideration for the V.A.'s reinstating McLain to complete the Project, as the V.A. on May 3, 1988 declared McLain in default due to the nonperformance of McLain's subcontractor, Ergon Systems. It is understood further, however, that there are no other V.A. generated costs to be assumed by McLain.

Letter from Jim McLain, McLain Plumbing & Electric Service, Inc., to Cheryl Hannon, Contracting Officer, VA contract (May 23, 1988). On August 1, 1988, although reciting an effective date of May 23, 1988, the defendant duly accepted the offer of an accord. Memorialized in the form of a contract modification, the formal acceptance notification agreed to the terms of the proposed recovery

schedule, extending the term of completion to November 18, 1988. Thus, citing this bilateral agreement between the parties to the VA contract for an alternative performance, the defendant proffers the accord. Further, by reference to the "smooth" execution of the substituted performance, the defendant also points to the completion of the modified VA contract by the plaintiff and the plaintiff's new subcontractor, Mississippi Controls. Thus, citing the execution of this alternative performance, the defendant proffers the satisfaction. Therefore, the defendant proffers an accord and satisfaction.[4]

 Contrastingly, as inferred above, the plaintiff argues against the presence of an accord and satisfaction by denying the existence of a "meeting of the minds" and of consideration. Yet, while the plaintiff challenges a meeting of the minds by claiming a lack of intent, the plaintiff only generally denies consideration. As for consideration, however, the defendant presents the contract modification as persuasive evidence. Indeed, as adopted by the modification, the plaintiff's own recovery schedule explicitly recites the consideration: "The above costs to be absorbed by McLain are in consideration for the V.A.'s reinstating McLain to complete the Project * * *." As such, the evidence clearly repudiates the plaintiff's denial of consideration. As for a meeting of the minds, the intent of the parties controls. *Black v. Denver United States Nat'l Bank,* 362 F.2d 38, 41 (8th Cir.), *cert. denied,* 385 U.S. 990, 87 S.Ct. 596, 17 L.Ed.2d 451 (1966); *CYR Constr. Co. v. United States,* 27 Fed.Cl. 153, 160 (1992). And, again, the contract modification represents the best source of evidence regarding intent. Apparently, the plaintiff contends that the recovery schedule as adopted by the contract modification provides no basis for alternative performance, but to the contrary, this schedule constitutes adequate evidence of an accord. The recovery schedule clearly defines the intentions of the plaintiff in submitting a proposal for alternative performance, and the defendant accepted the offer without modification or res-

ervation. Further, the accord expressly incorporates the terms of the recovery schedule. As this accord illustrates, a more definite example of a meeting of the minds is hard to find. Thus, pursuant to the satisfaction of the accord as recited herein, the Court concludes that the parties to this contract executed a valid accord and satisfaction.

 Therefore, having found the existence of an accord and satisfaction, this Court determines the scope thereof. Indeed, in the event of a finding of an accord and satisfaction, the plaintiff presents further arguments regarding the scope of the discharge. While the defendant proffers that the discharge affects the entire contract, the plaintiff seeks a more limited reading but presents no evidence to support such an interpretation. Indeed, the evidence demonstrates the opposite. Upon consideration of the terms of the modification, this Court finds that the parties executed an agreement to substitute the entire contract performance. In fact, the VA even required the removal of the equipment installed by the original primary subcontractor for replacement by the new primary subcontractor. Clearly, both parties intended the substitution of all the contract rights from the original VA contract to the contract as modified. Moreover, in the instant contract, the parties agreed to substitute alternative performance in lieu of terminating the VA contract for default. Thus, in contrast to those situations where a modification discharges only certain claims, where the modification relies upon a claim of default, the effect of the discharge applies uniformly to the entire contract unless otherwise provided. This reading seems the only logical interpretation. Had the plaintiff intended a qualification or reservation within the accord, the plaintiff should have made such manifest and explicit in the written agreement. *United States v. William Cramp & Sons Ship & Engine Bldg. Co.,* 206 U.S. 118, 128, 27 S.Ct. 676, 678, 51 L.Ed. 983 (1907); *Cannon Constr. Co. v. United States,* 162 Ct.Cl. 94, 101, 319 F.2d 173, 177 (1963).

---

4. As the defendant briefs only accord and satisfaction, and as the evidence supports a finding based thereon, this Court avoids a finding on whether the purported accord comprised a sub-

stituted contract. *See generally* John Cibinic, Jr., *Discharge Devices: Fifty Ways to Leave Your Claim,* 3 NASH & CIBINIC REP. ¶ 73, at 156 (1989).

Thus, absent exigent circumstances, the discharge applies to the entire contract.

### Economic Duress

■ In the event of a finding by this Court of accord and satisfaction, the plaintiff here argues for the exigent circumstance of economic duress to avoid discharge.[5] The plaintiff here claims that the alternative posited by the VA of terminating the original subcontractor in favor of another subcontractor, or face default termination, constituted coercive acts. The plaintiff recites:

> In McLain, as demonstrated by the evidence, the contractor had no choice but to accept the terms of reinstatement (post default) in order to avoid a disastrous default termination which would serve to cripple any government contractor. Secondly, there was no alternative for McLain, simply stated, McLain could default its subcontractor or be defaulted. The government would not consider any revised schedule (i.e. request for extension of time[) ], so long as ESI remained on the project. Thirdly, it is only too clear that the circumstances of resulting in the execution of the Amendment were the direct result of the coercive acts of the government personnel.

Plaintiff's Motion for Summary Judgment, at 17 (citation omitted). For the foregoing three reasons, the plaintiff contends that it had no choice but to accept the terms of the proposed alternative to default termination. The result, the plaintiff states, constituted economic duress.

In contrast, the defendant contends that the United States sought no remedies other than those conferred under the terms of the contract. Thus, upon untimely performance, the defendant cites the right to terminate under the Default clause of the contract. The defendant points out: "At worst, the VA merely insisted upon its rights under the contract and reminded McLain of the consequences of nonperformance. Such conduct is neither offensive nor illegal." Defendant's Reply, at 3. As such, the defendant argues that the offer to consider an alternative performance, in the form of a recovery schedule and upon the replacement of the subcontractor, constituted nothing more than an attempt at settlement. Further, as the plaintiff purportedly presents no evidence of coercion, the defendant denies any showing of economic duress. Based on the evidence presented, this Court finds the defendant's arguments persuasive.

■ Duress arises in a situation where a party demonstrates that its manifestation of assent to a contractual agreement resulted by inducement or other improper threat that left the party with no reasonable alternative but to agree. *David Nassif Assocs. v. United States*, 226 Ct.Cl. 372, 385, 644 F.2d 4, 12 (1981) (citing RESTATEMENT, SECOND, OF CONTRACTS § 317 (Tent.Draft No. 11, April 1976)). Economic duress, similarly, arises in such situations where the threat involves not a crime or tort but economic harm. *Id.* (citing RESTATEMENT, SECOND, OF CONTRACTS § 318 (Tent.Draft No. 11, April 1976)). The Court of Claims recited the rationale of the precept as follows:

> Such forms of economic duress, or, as it is sometimes also called, business compulsion, include threats that would breach a duty of good faith and fair dealing under a contract as well as threats which, though lawful in themselves, are enhanced in their effectiveness in inducing assent to unfair terms because they exploit prior unfair dealing on the part of the party making the threat.

*Id.* Yet, in order to substantiate an assertion of economic duress, a party must show more than mere financial harm or economic tension. *Peters v. United States*, 694 F.2d 687, 694 (Fed.Cir.1982); *International Tel. & Tel. Corp. v. United States*, 206 Ct.Cl. 37, 52 n. 11, 509 F.2d 541, 549 n. 11 (1975); *Progressive Bros. Constr. Co. v. United States*, 16 Cl.Ct. 549, 554 (1989); *see Aircraft As-*

---

5. As explained by Professors Cibinic and Nash, in Government contracting, a party may seek to avoid the consequences of discharge by asserting six legal arguments: lack of consideration, nonperformance of agreement, mistake, economic duress, fraud, and lack of authority. CIBINIC & NASH, ADMINISTRATION OF GOVERNMENT CONTRACTS, at 935–43. Here, the plaintiff asserts only economic duress.

socs. & Mfg. Co. v. United States, 174 Ct.Cl. 886, 896, 357 F.2d 373, 378 (1966) ("Economic duress may not be implied merely from the making of a hard bargain."). In Government contracting, however, a valid claim of economic duress must demonstrate a coercive situation created by Government conduct. Asberry v. United States Postal Serv., 692 F.2d 1378, 1381 (Fed.Cir.1982); La Crosse Garment Mfg. Co. v. United States, 193 Ct. Cl. 168, 177, 432 F.2d 1377, 1382 (1970); Du Puy v. United States, 67 Ct.Cl. 348, 381, 1929 WL 2470 (1929); G.M. Shupe, Inc. v. United States, 5 Cl.Ct. 662, 674 (1984). Thus, upon a proper factual showing of such duress constitutes an exceptional circumstance whereby a party may avoid a discharge by accord and satisfaction. Shelton v. United States, 215 Ct.Cl. 908, 911, 1977 WL 9598 (1977).

▮ As referenced by the parties, an analysis of economic duress involves three factors: (1) whether one side accepted the terms of another involuntarily, (2) whether the circumstance permitted no alternative but to accept the terms offered, and (3) whether the acceptance of the terms resulted from the coercive acts of the opposite party. Fruhauf Southwest Garment Co. v. United States, 126 Ct.Cl. 51, 62, 111 F.Supp. 945, 951 (1953); Robinson Contracting Co. v. United States, 16 Cl.Ct. 676, 687 (1989). As for the first element, the plaintiff presents no evidence to support the involuntary acceptance of the terms of the modification. In fact, the evidence demonstrates the opposite because the plaintiff, not the defendant, sought and then proposed a recovery schedule. As for the second element, the plaintiff likewise presents no evidence to demonstrate that McLain had no alternative but to submit the recovery schedule. As the defendant points out, the plaintiff had at least one alternative, that is, to allow the termination for default and completion by the surety. As for the third element, the plaintiff again presents no evidence of coercive acts by the defendant except to claim coercion by the threat of default. However, if justified, the valid warning of termination for default constitutes no more than the insistence on those rights guaranteed by the contract. See, e.g., Liebherr Crane Corp. v. United States, 810 F.2d 1153, 1158 (Fed.Cir.1987) ("The Navy merely insisted on its rights under the contract and reminded Liebherr of the severe consequences of default."); Robinson Contracting Co. v. United States, 16 Cl.Ct. 676, 687 (1989) ("At worst, the record indicates that the Corps merely insisted on its rights under the contract and reminded plaintiff and its counsel of the severe consequences of default.").

▮ Thus, as the plaintiff demonstrates no Government conduct representing coercion, the plaintiff further fails the basic requirement of proving economic duress. Finding no evidence to the contrary, this Court therefore concludes that the defendant acted within the bounds of the duty of good faith and fair dealing. Systems Technology Assocs., Inc. v. United States, 699 F.2d 1383, 1387 (Fed.Cir.1983). Furthermore, as the defendant points out, the fourteen-month delay in asserting coercion certainly detracts from the plaintiff's assertions of economic duress. See Johnson, Drake & Piper, Inc. v. United States, 209 Ct.Cl. 313, 323, 531 F.2d 1037, 1043 (1976) (indicating that a delay in asserting duress diminishes the likelihood thereof). Resultingly, as the plaintiff demonstrates none of the elements of duress, this Court finds no showing of economic duress under the circumstances here present.

Nevertheless, the plaintiff alleges that the delays during the beginning of contract performance resulted in the late completion of the VA contract. Resultingly, because the plaintiff blames the defendant for these delays, the plaintiff again claims economic duress. If the delays resulted in the untimely performance, the plaintiff contends then that the threat of termination during the forbearance period constituted duress. See ADMINISTRATION OF GOVERNMENT CONTRACTS, at 940 ("Improper threats to default terminate a contract have also been held to constitute duress."). Specifically, the plaintiff points to the long delays caused by the technical submittals. By reference to the alleged proprietary nature of some of the computer hardware, and to the alleged defective specifications regarding the computer software, the plaintiff contends that the defendant caused the long delays in the initial days of contract performance. The defendant, not surprisingly, paints a different picture. As for the

computer hardware, the defendant points out that Deas provided the plaintiff and its original subcontractor with the names of at least three companies that could satisfy the specified computer hardware requirements. As such, the defendant persuasively demonstrates that the equipment contrasted from the proprietary system contended by the plaintiff. As for the computer software, neither the plaintiff nor the defendant present ample evidence for a finding on this matter. However, this Court notes that, had the plaintiff actually considered this matter of sufficient importance to result in a compensable or excusable delay, then the plaintiff should have submitted a delay claim to the contracting officer at that time. Furthermore, as this Court reads the pleadings, the bulk of the delays resulted not from the single issue of computer hardware or computer software technical submittals, but from compliance with the technical submission requirements as a whole. As such, this Court finds that the evidence shows that the plaintiff, and not the defendant, caused the delays. *See id.* ("Note, however, that where the contractor's own delays cause the contracting officer to threaten default, duress will generally not be found."). Therefore, this Court again rejects any finding of economic duress.

■ Finally, aside from the issue of coercion or economic duress, this Court realizes that the plaintiff considers the discharge of all the rights and obligations under the original contract by the subsequent modification as an inequitable result. Indeed, pursuant to the discharge by accord and satisfaction, the plaintiff incurred a liability of $143,700, plus other costs and expenses, by the arbitration award in favor of ESI. As an initial matter, of course, this Court maintains no general equitable jurisdiction. *Wright v. United States,* 19 Cl.Ct. 779, 782 n. 7 (1990); *TRW Envtl. Safety Sys., Inc. v. United States,* 18 Cl.Ct. 33, 42 (1989). Thus, even if this Court considered the plaintiff to be entitled to some remuneration, this Court possesses no means to do so in equity. As a practical matter, however, even had no discharge occurred, this Court would not have found the plaintiff entitled to any recovery, not only as a matter of law but also as a matter of practicality. In short, the plaintiff's failure to prevail in this case involves the inadequate allocation of risks within the contract terms. At the point when the parties realized that a supplemental agreement had become necessary, the parties should have expressly agreed, and memorialized such an agreement in writing, regarding the allocation of risks regarding past, present, and future claims. Had the plaintiff suspected that the defaulted original subcontractor would later demand payment, as it probably did (or should have), and had the plaintiff intended to indemnify itself therefor, the plaintiff should have demanded a reservation of rights regarding such a liability within the terms of the modification. Similarly, even though the law presumes the absence of such reservations, the defendant likewise should have recited an express discharge of all claims under the original contract within the modification; thus, although legally unnecessary, such preventative measures would inhibit any possible claims of breach of the duty of good faith and fair dealing. Whether applying to the plaintiff or to the defendant, these matters of common sense in Government contracting apply to all participants. Nevertheless, for purposes of this case, and particularly in view of the legal presumption regarding the reservation of rights, the heaviest burden fell upon the plaintiff.

For the foregoing reasons, this Court finds no basis for the claim of economic duress, and accordingly, declares the proper discharge of the original VA contract by accord and satisfaction. Thus, as all the claims sought by the plaintiff in this action had been discharged, the plaintiff presents no factual or legal basis for recovery.

## CONCLUSION

Therefore, pursuant to the discharge of all claims under the original VA contract by accord and satisfaction, and in the absence of any evidence of economic duress, this Court denies the plaintiff's motion for summary judgment, grants the defendant's cross-motion for summary judgment, and orders the plaintiff's complaint to be dismissed.

Each party is to bear its own costs.