JACKSON CONSTRUCTION CO., INC.

v.

The UNITED STATES

No. 97–31C.

United States Court of Federal Claims.

Sept. 15, 2004.

John P. Davey, Canton, MA, attorney of record for the plaintiff.

James W. Poirier, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for the defendant.

## OPINION

YOCK, Senior Judge.

This dispute arose out of a construction contract between the plaintiff, Jackson Construction Company, Inc. ("Jackson"), and the defendant, the Department of the Army New York District Corps of Engineers ("Corps"). Evidence and testimony was presented to the Court at a trial held in this case on April 20–22, 2004. In accordance with Contract No. DACA 51–92–C–0092 ("Contract"), Jackson constructed a new building for the Corps, the Technical Information Analysis Center ("TIA Center"), which was located on the grounds of the Corps' Cold Regions Research and Engineering Laboratory ("CRREL") in Hanover, New Hampshire. Jackson began construction on October 26, 1992, and completed the TIA Center on March 30, 1994, the completion date mandated by the Contract. Jackson was paid $4,183,189 under the Contract, which included the lump-sum Contract price of $3,565,000 plus $618,189 in additional compensation for changes to the work that were agreed upon and authorized by bilateral modifications. Although Jackson completed the work within the time mandated by the Contract and was paid for all the changes required by the Corps, Jackson nevertheless brought this lawsuit in which it seeks to recover additional compensation in the form of delay and impact damages.

At trial, Jackson presented two separate claims, an early completion delay claim and an impact claim. First, Jackson contends that it had to overcome a 120–day delay at the start of the project, during which Jackson redesigned and relocated a waterline that ran through the footprint of the new building. According to Jackson, "[t]his early delay, occasioned by the redesign and relocation of the utilities, carried over a one hundred twenty (120) day period from late October of 1992 through March of 1993." Pl., Jackson Construction Company's Mem. in Support of Pl.'s Claims for Delay and Impact Costs and Unabsorbed Overhead Costs at 3 ("Pl.'s Post-trial Mem.").[1] Under Count I, Jackson seeks $196,338 in damages for this claim, which represents additional home office overhead incurred during the delay period calculated using the Eichleay formula.

Second, Jackson has claimed additional damages that were allegedly incurred due to the cumulative impact of the numerous changes required by the Corps during the course of performance. According to Jackson, the Corps issued hundreds of changes, which resulted in 24 bilateral modifications that increased the Contract price by $618,189. See Pl.'s Post-trial Mem. at 1, 3. Under Count II, Jackson requested $135,078 for this cumulative impact claim, which it calculated using the total cost method. Finally, Jackson's Complaint had also asserted an additional claim for extra work totaling $35,325 under Count III, but this claim was dismissed before the trial because the parties reached a settlement regarding payment for the claimed extra work.

After conducting a trial on the merits of Counts I and II and considering all of the evidence presented at trial, the Court concludes that the defendant prevails in this action.[2] First, Jackson's claims under Count

1. In its initial claim submitted after the work was completed and even later in its Complaint, Jackson had asserted that this delay lasted from October 30, 1992, through February 25, 1993, a period of 119 days. See Joint Ex. 59/2 (Jackson's claim for $196,338, dated September 8, 1994); accord Compl. at ¶ 23.

2. The defendant filed several motions in limine seeking the exclusion of certain evidence from trial. The Court withheld issuing any formal ruling on these motions prior to the end of trial, and they are now moot. After the post-trial briefing was completed, the defendant filed a Motion to Strike References to Deposition Testimony Not in the Trial Record. The Court agrees with the defendant's position and hereby grants the defendant's motion to strike. In reaching its decision on the merits, the Court did not consider any of the disputed deposition testimony referenced in the plaintiff's post-trial briefs. The

I and Count II are barred by the doctrine of accord and satisfaction. Second, even if Jackson's claims were not barred by accord and satisfaction, Jackson failed to prove either claim on the merits. On Count I, Jackson did not meet its burden of proving the existence and extent of a compensable delay, nor did it prove entitlement to Eichleay damages under an early completion theory. On Count II, Jackson did not meet its burden of proving the existence of a cumulative impact claim, nor did it prove entitlement to damages under a total cost theory. Accordingly, judgment must be entered on behalf of the defendant on both Count I and Count II of the Complaint.

*Facts*

### A. The Contract

On September 23, 1992, Jackson submitted its bid for the TIA Center project, which was located at the Corps' existing CRREL facility in Hanover, New Hampshire. The Corps awarded the Contract to Jackson on September 30, 1992, and the parties executed Contract No. DACA 51–92–C–0092 in the amount of $3,565,000. The total Contract price included Jackson's base bid amount of $3,550,000, which covered all labor, materials, equipment, and services required to construct the TIA Center, and an additional $15,000 for an optional item, demolition of the ATCO building at the CRREL facility. By the time the Corps made final payment upon Jackson's completion of the Contract, the Corps had paid Jackson a total of $4,183,189, which included the full Contract price of $3,565,000 plus an additional $618,189 resulting from 24 bilateral modifications. These bilateral modifications compensated Jackson for changes that occurred during the course of performance.

The Contract required Jackson to "complete the entire work ready for use not later than 520 calendar days after the date the Contractor receives the notice to proceed * * *." Joint Ex. 1, Contract, Section H.1.a. The parties have stipulated that the Corps issued the notice to proceed on October 21, 1992, and that Jackson acknowledged receipt of that notice on October 26, 1992. The

parties further stipulated that Jackson achieved beneficial occupancy 520 days later, on March 30, 1994. Jackson, however, contends that it would have completed the Contract four months earlier if it had not been for delays caused by the Corps at the beginning of the project. At trial, Jackson attributed most of the delays to problems that it had encountered with an 8–inch waterline that ran through the footprint of the new building. According to Jackson, this problem with the waterline hindered its progress from October 1992 through March 1993.

### B. Waterline relocation

Much of the evidence heard at trial related to Jackson's assertion of a 120–day delay at the beginning of the Contract arising from its relocation of an 8–inch waterline that was located within the footprint of the new TIA Center. This waterline serviced several existing buildings that were adjacent to the new construction. The drawings that accompanied the bid solicitation depicted the waterline's location within the footprint and contained a note that confirmed the contractor's responsibility to maintain water service to the adjacent buildings at all times during construction and to protect the waterline "from the elements" during construction. Def.'s Ex. 83/6 (Plans Sheet C–1, Rev. 1, Note 2).

Much of the testimony regarding the difficulties experienced by Jackson related to this waterline came from Jackson's superintendent, Mr. John Sullivan, who was responsible for overseeing the work on a daily basis. Mr. Sullivan became involved in the project in late October 1992, as Jackson mobilized at the site following receipt of the notice to proceed. According to Mr. Sullivan, at the very beginning of his involvement, Jackson's estimator, Mr. Vinny Murphy, had alerted him that it was going to be a "problem * * * to work around the waterline" within the footprint. Tr. at 200. Mr. Sullivan described the Corps' plan to maintain the waterline within the footprint during construction as both a logistical problem and a potential hazard:

Court notes, however, that none of this additional deposition testimony offered by the plaintiff

would have affected the Court's decision in this case.

A * * * You know, nothing is impossible. We put a man on the moon, so obviously we can put up this building. You know, it's never an issue. But the problem was that we were inviting trouble.

Q Why?

A Because we're going to have to hold this thing six or eight feet up in the air, halfway though the winter, and try and excavate and then put a foundation in and put in structural steel and get this building up and running, all the time having this waterline in the middle of nowhere.

Q So the waterline then, this 8-inch waterline, would have been exposed through the middle of 40 degree below weather, exposed?

A Right.

Q Would it have frozen, in your opinion?

A We would have tried everything humanly possible not to let that happen, because it would have been our problem. But being realistic, yeah. Would we have made every effort? Absolutely. Would we have lost? Possibly.

Tr. at 103–04. Mr. Sullivan was adamant that it would have been dangerous, costly, and inefficient to maintain the waterline in its current location during construction. Nevertheless, he acknowledged that Jackson bid the job according to the plans and specifications, and he conceded that Jackson would have "worked around" the waterline if they could not resolve this potential problem with the Corps. Tr. at 203.

Although Jackson had identified the waterline as a problem from the outset, it had not finalized a plan for dealing with the waterline prior to mobilizing at the site. Jackson also understood that it had at least two alternatives if it did not want to maintain the waterline within the footprint. First, the plans allowed for Jackson to build a temporary line outside the footprint to provide the required water service during construction. Second, Jackson could devise its own plan to permanently relocate the waterline in a location outside the building's footprint. During November and early December 1992, Jackson discussed all three options (including leaving the waterline in the footprint) with several potential subcontractors before concluding that the best approach would be to permanently relocate the waterline outside the footprint.

During these first two months of the Contract, Jackson obtained proposals to relocate the waterline before ultimately accepting a proposal submitted by Denron Plumbing and HVAC, Inc., dated November 19, 1992, in the amount of $10,537. The record is unclear as to the exact date when Jackson first discussed this or any other waterline relocation proposal with the Corps. Mr. Sullivan thought that he had discussed this issue with the Corps some time in November 1992, although he had no specific recollection of any such conversation. The first notation in Mr. Sullivan's daily reports of any discussion with the Corps about the waterline problem was a reference to a meeting that he had with Capt. Raymond Prisk on December 4, 1992. Following this initial meeting, on December 8, 1992, Jackson submitted an initial sketch of their waterline relocation plan and then submitted a formal shop drawing on December 22, 1992.

The Corps approved Jackson's plan on December 28, 1992, with a notation that the work was to be performed at no additional cost to the Government. In the meantime, Jackson had begun excavation within the footprint on December 17th, and it took delivery of pipes for the waterline relocation on December 29th, just one day after receiving the Corps' approval. Jackson continued performing excavation and utility work (including the waterline relocation) during the winter months, to the extent that the weather allowed it to do so. Jackson completed the installation and tie-in of the permanent waterline on February 6, 1993, and progressed with the excavation to the point where it was able to start pouring concrete for the TIA Center's foundation by the end of March 1993.

On March 9, 1993, Jackson submitted a claim for the waterline relocation work, seeking $18,212 in additional direct costs, plus profit and overhead. See Pl.'s Ex. 18. Jackson, however, did not claim any delay to its schedule or request any additional time for the waterline work. See id. The Corps

initially disclaimed responsibility for any additional costs related to waterline relocation but ultimately relented and settled Jackson's claim. Jackson received $15,212 for the waterline relocation work as part of Modification No. P–00009, which Jackson executed on January 14, 1994. *See* Joint Ex. 10. This modification—along with all of the other bilateral modifications executed by the parties—included the following stipulation regarding schedule delays and impact damages:

> The contract period of performance remains the same. It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the contractor and his subcontractors and suppliers for all costs and markup directly or indirectly, including extended overhead, attributable to the change order, for all delays related thereto, and for performance of the change within the time frame stated.

Joint Ex. 10/3.

Jackson ultimately recovered from the early problems that it had encountered in relocating the waterline, and the work progressed on schedule. Jackson achieved beneficial occupancy on March 30, 1994, the completion date mandated by the Contract. While Jackson achieved timely completion, Jackson contends that it would have completed the Contract early if it had not been for an alleged 120–day delay resulting from the waterline work. Jackson has also complained that its progress was slowed by an inordinate number of changes issued by the Corps. Jackson's witnesses testified that the Corps issued over 150 changes to the Contract, which ultimately resulted in 24 bilateral modifications that were worth $618,189. Jackson's witnesses testified specifically about several of the other changes in addition to the waterline relocation that impacted its performance: (1) additional piping needed to deal with an artesian well discovered at the site; (2) relocation of fiber optic ducts; (3) revisions to the elevator layout; (4) relocation of the air handler and chiller; (5) additional structural support required for certain curtain wall tie-

ins; and (6) upgrades to the heating system. According to Jackson, these and all of the other changes required by the Corps impacted its progress and increased the cost of the work beyond the individual amounts accounted for in the bilateral modifications that had been executed by the parties.

### C. Jackson's in-house early completion schedule and the official schedule

At trial, Jackson presented the Court with two schedules that it had created prior to the start of work, a 14–month schedule and a 17–month schedule. Jackson contends that the Court should measure its delay claim using the 14–month schedule, which showed early completion, while the Corps contends that Jackson has no delay claim because the Contract was completed within the timeframe set forth in the 17–month schedule.

Jackson first created an in-house schedule on October 26, 1992, which showed a "Project Start" date of October 26, 1992, and a "Project Finish" date of December 30, 1993, a total performance period of just over 14 months. *See* Pl.'s Ex. 4. For the sake of clarity, the Court will refer to this schedule as the "in-house schedule." Jackson contends that it intended to complete the Contract early using this in-house schedule but was thwarted by the Corps' delays. Jackson, however, did not submit this in-house schedule to the Corps until August 1994, after it had already completed the project.

Jackson created another schedule that had a duration of a little more than 17 months. *See* Pl.'s Ex. 6A. For the sake of clarity, the Court will refer to this schedule as the "official schedule." Jackson submitted this 17–month schedule to the Corps for approval on November 4, 1992. The Corps verbally accepted Jackson's official schedule on November 16, 1992, and returned a copy of this schedule to Jackson on December 1, 1992, with the notation, "Accepted without note." *See id.* Jackson's official schedule showed a "Project Start" date of October 26, 1992, and a "Project Finish" date of April 6, 1994.[3]

---

**3.** Although the Contract required Jackson to achieve beneficial occupancy by March 30, 1994, the Corps approved the official schedule, which showed this milestone occurring on April 6, 1994. Since Jackson met the earlier milestone, the Court need not speculate why the parties

Thus, Jackson's in-house schedule shows the Contract finishing 97 days earlier than the completion date set forth in the official schedule. This 97-day variance in the completion dates appears to be attributable to one significant difference in the two schedules: Jackson's official schedule planned for a shutdown during the 1993–94 winter whereas its in-house schedule planned for continuous work during those months. According to Jackson's official schedule, after mobilization, Jackson planned to perform utility relocation (including the waterline and other utilities), a portion of the bulk excavation, and demolition of a small building known as the ATCO building, all of which were to occur by mid-December 1993.[4] Following these activities, however, the official schedule planned no activities from mid-December 1993 through mid-March 1994, when excavation was to resume followed by concrete work.

While Jackson's in-house schedule depicts the same sequence of activities through mid-December 1993, the in-house schedule planned for excavation to continue through December 22, 1992, followed by concrete work (December 23, 1992, through February 19, 1993) and structural steel (February 22, 1993, through March 19, 1993). Other than the existence of an approximately three-month period of inactivity in the official schedule, Jackson's two schedules are nearly identical. Both schedules show the work starting on the same date, October 26, 1992, and then following roughly the same sequence and duration of activities through completion.

D. Jackson's claims under Counts I and II and the Corps' accord and satisfaction defense

Jackson presented two separate claims at trial: (1) a claim for $196,338.00 in additional home office overhead for its early completion delay claim, which it calculated using the Eichleay formula; and (2) a claim for

$135,078.33 for additional costs resulting from the cumulative impact of the changes and alleged design deficiencies on the project, which it calculated using the total cost method.

While the Corps has refuted both of Jackson's claims on the merits, it has also raised the affirmative defense of accord and satisfaction. At trial, the Corps presented evidence that Jackson had already settled and received payment for all of the changes, design deficiencies, and delays upon which the Court heard evidence at trial. The Corps demonstrated that each of the specific problems identified by Jackson's witnesses at trial had already been resolved and paid for through bilateral modifications that the parties had agreed upon during the course of the work. Each of the bilateral modifications that were executed by Jackson included the same language, which was quoted earlier in this opinion in the Court's discussion of Jackson's waterline relocation claim (P–00009):

> The contract period of performance remains the same. It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the contractor and his subcontractors and suppliers for all costs and markup directly or indirectly, including extended overhead, attributable to the change order, for all delays related thereto, and for performance of the change within the time frame stated.

Joint Ex. 10/3.

The Corps argues that, to the extent the project was delayed by the waterline relocation or by any of the other specific problems identified by Jackson at trial, this release language bars Jackson from obtaining additional damages. Moreover, the Corps argues that Jackson cannot seek additional damages for the cumulative impact of all of the changes on the Contract because Jackson similarly agreed to release the Corps from liability for these damages. The Court will first address this threshold issue before addressing the merits of Jackson's claims.

---

utilized this later completion date for scheduling purposes.

4. The Court is unable to ascertain the exact dates of the individual activities on Jackson's official schedule because this schedule only provides details for the month and year in which activities were planned. The only exact dates provided on this schedule are the start and finish dates for the Contract.

## Discussion

### I. Jackson's claims under Counts I and II are barred by accord and satisfaction.

■ Both Jackson's delay claim under Count I and its cumulative impact claim under Count II are barred by the doctrine of accord and satisfaction. The parties executed 24 bilateral modifications during the Contract that covered the specific items upon which Jackson's delay claim is based, including modifications for the waterline relocation (No. P–00009) and the other specific problems identified by Jackson at trial. All of the bilateral modifications included the same release provision, including No. P–00009, which settled Jackson's waterline relocation claim:

> The contract period of performance remains the same. It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the contractor and his subcontractors and suppliers for all costs and markup directly or indirectly, including extended overhead, attributable to the change order, for all delays related thereto, and for performance of the change within the time frame stated.

Joint Ex. 10/3.

Jackson's delay claim is premised mainly upon the problems that it encountered in relocating the 8–inch waterline, a claim for which Jackson received additional money but no additional time. *See id.* Jackson did not make a timely reservation of rights to assert additional damages for the problems associated with this work, either in its original claim or at any other time prior to the execution of Modification No. P–00009. The evidence shows that Jackson did not even attempt to assert an additional delay claim for this work until after the Contract had already been completed. The same rationale applies to Jackson's cumulative impact for the changes required by the Corps. Jackson never attempted to reserve its rights to assert a cumulative impact claim at any time during the work.

While Jackson concedes that it executed bilateral modifications that cover the very same claims that it presented at trial, Jackson presents four arguments in an effort to avoid the effect of the release language: (1)

that it made a written reservation of rights to assert an impact claim at a later date; (2) that the modifications were ambiguous; (3) that the modifications were the result of misrepresentations by the Corps; and (4) that the modifications were executed under duress. None of these arguments are supported by the evidence.

### A. The elements of an accord and satisfaction

■ The doctrine of accord and satisfaction is an absolute defense that terminates any previous right that a party may have had to assert a claim of the same subject matter. *See C & H Commercial Contractors, Inc. v. United States,* 35 Fed.Cl. 246, 252 (1996) (quoting *Chesapeake & Potomac Tel. Co. v. United States,* 228 Ct.Cl. 101, 108, 654 F.2d 711, 716 (1981)); *accord McLain Plumbing & Elec. Svc., Inc. v. United States,* 30 Fed.Cl. 70, 79–80 (1993). An "accord" is a contract under which both parties agree that one party will render additional or alternative performance in order to settle an existing claim made by the other party, and "satisfaction" is the actual performance of the accord. *See id.* The party asserting an accord and satisfaction defense must establish four elements: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds; and (4) consideration. *See id.; accord Brock & Blevins Co. v. United States,* 170 Ct.Cl. 52, 59, 343 F.2d 951, 955 (1965).

■ An executed bilateral modification with a release provision usually constitutes an accord and satisfaction unless that release is either ambiguous or limited in scope. *See Merritt–Chapman & Scott Corp. v. United States,* 198 Ct.Cl. 223, 228–30, 458 F.2d 42 (1972); *Brock & Blevins,* 170 Ct.Cl. at 59, 343 F.2d at 954–55. A contractor may preserve its rights by explicitly reserving its rights to assert additional claims for the work covered by the modification. *See id.* While the language of the release is a good starting point for this analysis, the Court must look beyond the mere existence or nonexistence of any release language or reservation of rights in a bilateral modification. "[W]hile an accord and satisfaction *may* contain an express release for the immediate

discharge of a contractual right or obligation, a release constitutes no condition precedent to discharge by accord and satisfaction." *McLain Plumbing*, 30 Fed.Cl. at 79.

Therefore, the Court must focus on whether or not the parties' objective manifestations of intent demonstrate that they reached a meeting of the minds with respect to the release of additional claims. *See McLain Plumbing*, 30 Fed.Cl. at 80–81. This is particularly true where a purported release is ambiguous in its scope. *See Dureiko v. United States*, 209 F.3d 1345, 1356–57 (Fed. Cir.2000). In such instances, the Court may consider parol evidence in order to construe the release in accordance with the parties' intent at the time of execution. *See id.* The Court may also consider evidence to determine if additional negotiations occurred after the execution of· the bilateral modification. *See Westerhold v. United States*, 28 Fed.Cl. 172, 175 (1993); *see also Kenbridge Constr. Co. v. United States*, 28 Fed.Cl. 762, 765 (1993). The rationale in such instances is that "the Government's consideration of the merits of a claim, following the execution of a release, indicates that the parties did *not* intend the release to extinguish the claim, and hence did not bar the contractor's earlier claim." *Westerhold*, 28 Fed.Cl. at 175 (quoting *A & K Plumbing & Mech., Inc. v. United States*, 1 Cl.Ct. 716, 723 (1983)).

█ Furthermore, even if the parties have executed a clear and unambiguous release, this Court can void or reform the release on several grounds, including lack of consideration, lack of performance, lack of authority, unilateral or mutual mistake, misrepresentation, duress, or under other circumstances in which the parties' conduct evinces an intent to allow additional claims. *See C & H Commercial Contractors*, 35 Fed.Cl. at 255; *McLain Plumbing*, 30 Fed.Cl. at 82, n. 5; *Kenbridge Constr. Co.*, 28 Fed.Cl. at 765; *T.L. Roof & Assoc. Constr. Co. v. United States*, 28 Fed.Cl. 572, 577 (1993). While the Court acknowledges the validity of these exceptions, it is not convinced that any of these exceptions are warranted in this case.

**B. Jackson did not explicitly reserve its rights to assert an additional delay or impact claim.**

█ First, the Court rejects Jackson's argument that it explicitly reserved its rights to assert either a delay or a cumulative impact claim at a later date. Jackson relies upon language that it inserted underneath the Corps' release in Modification Nos. P–00022 and P–00024: "Jackson Construction Company has disputed this statement. Jackson believes the time period to have been extended 120 days due to delays, changes, etc." Joint Ex. 23/2, 25/2. Even if this notation were sufficient to constitute a valid reservation of rights, the scope of the language utilized by Jackson only addresses Jackson's delay claim (Count I). Therefore, Jackson's cumulative impact claim (Count II) would still be barred by accord and satisfaction.

Jackson's attempt to reserve its rights on either claim, however, is not valid because it was not made in a timely manner. Modification Nos. P–00022 and P–00024 are unrelated to the waterline relocation problems that allegedly delayed Jackson's work. Moreover, Jackson, executed Modification No. P–00022 on October 13, 1994, and No. P–00024 on May 10, 1996, after Jackson had accepted full payment for the waterline work and the numerous other changes that had allegedly impacted its progress. *See* Joint Ex. 23/2, 25/2. By this time, Jackson had long since waived its rights to assert a delay or impact claim. To be clear, the language utilized in Jackson's reservation of rights would have been sufficient to preserve at least its delay claim arising from the waterline work if it had been inserted into the earlier modification that settled Jackson's waterline claim, *i.e.*, Modification No. P–00009. *See* Joint Ex. 10. Jackson, however, failed to reserve any future claim rights arising from the waterline work when it executed this modification on January 14, 1994. *See id.* It does not appear that Jackson had even considered submitting a delay claim at that time. Jackson did not request any delay damages when it submitted its claim for the waterline relocation on March 9, 1993. *See* Pl.'s Ex. 18. Indeed, Jackson did not submit its delay and

impact claims until much later, September 8, 1994.

Similarly, Jackson did not reserve its rights to assert future claims arising from any of the other specific performance problems that it presented at trial. As indicated in the table below, each of the other performance problems that Jackson presented at trial were resolved by the parties' execution of bilateral modifications that included release provisions that are substantively identical to the provision in Modification No. P–00009:

| Claim Description and Requisition No. | Mod. No. |
|---|---|
| Artesian well claim (R–0003) | P–00001 |
| Relocate fiber optic duct bank (R–0027) | P–00007 |
| Waterline relocation (R–0008) | P–00009 |
| Elevator pit claim (R–0020) | P–00013 |
| Relocate air handler (R–0040) | P–00013 |
| Curtain wall design changes (R–0048) | P–00013 |
| VAV boxes (R–0047) | P–00017 |
| Duct work changes (R–0086) | P–00023 |

*See* Joint Ex. 2, 8, 10, 14, 18, and 24.

In summary, there is no evidence in the record that Jackson ever notified the Corps of its intent to assert a delay or impact claim during the course of performance, let alone evidence that Jackson reserved its rights to assert future claims when it executed bilateral modifications. Thus, in the absence of any evidence that the Corps agreed to consider Jackson's delay and total cost claims on the merits, Jackson cannot rely on the two reservations of rights that it made after-the-fact in Modification Nos. P–00022 and P–00024, which are unrelated to the claims presented by Jackson at trial. The Court views Jackson's actions as an invalid attempt to revive claims that had already been extinguished by its execution of bilateral modifications.

The Court also does not find any evidence that the parties contemplated Jackson's filing of a separate delay or impact claim or that the Corps expressed a willingness to consider any such claims on the merits following the parties' execution of bilateral modifications for these changes. At trial, Jackson urged the Court to find such evidence of the Corps' purported willingness to consider Jackson's additional claims in a letter written by Mr. Gerald B. Byrne, the Corps' Area Engineer,

on October 31, 1994. *See* Joint Ex. 65/1. In that letter, Mr. Byrne acknowledged the reservation of rights that Jackson had made in Modification No. P–00022, but he noted that "[t]he modification is being processed and your 'delay dispute' will be considered as a part of your larger delay claim and not as a part of this modification." *Id.* Mr. Byrne further stated that he disagreed with Jackson's assertion of "an alleged delay of 120 days * * *." *Id.*

Jackson attempts to read Mr. Byrne's letter out of context. In this letter, Mr. Byrne was referring to Jackson's existing delay and impact claims, both of which had previously been submitted on September 8, 1994. Joint Ex. 59, 65. Mr. Byrne suggests no willingness to negotiate these claims or to reconsider the Corps' position that Jackson had failed to reserve its rights to assert these claims by its previous execution of bilateral modifications. It appears that the purpose of this letter was to inform Jackson of the Corps' position that Jackson's after-the-fact reservation of rights was unrelated to the changes included in Modification No. P–00022. Even Jackson's president and main witness, Mr. Paul Bordieri, conceded on cross-examination that the Corps had never indicated to Jackson that it would address delay claims that arose from previously executed bilateral modifications:

*Q But in October or November 1994, you didn't interpret this letter as meaning that the United States had changed its position and wasn't going to enforce any of the releases in the modifications, did you?*

*A No, no * * *.*

Tr. at 731. The Corps later rejected Jackson's delay and impact claims without further negotiations with Jackson or any indication that these claims would be given serious consideration on their merits.

This case is distinguishable from *Westerhold* and *Kenbridge,* both of which involved circumstances in which the Government's actions in accepting and negotiating the resolution of additional claims following the execution of a modification indicated that the parties had not intended to release all of the claims covered by the modification. *See*

*Westerhold,* 28 Fed.Cl. 172; *Kenbridge,* 28 Fed.Cl. 762. For example, *Westerhold* is an illustrative example of circumstances in which the Government's actions belie its accord and satisfaction defense. In that case, the contractor submitted a claim for direct costs, delay costs, and a time extension resulting from changes ordered by the Government. The Government agreed to the direct cost portion of the claim but rejected the time extension and delay costs, and the parties executed a bilateral modification for the amount of direct costs. This modification did not refer to the contractor's delay claim, however, and the parties continued negotiating the delay component. The Government ultimately denied the claim and then asserted an accord and satisfaction defense at trial. On these facts, the Court held that the parties' continued negotiations were evidence that the executed bilateral modification did not encompass a meeting of the minds on the contractor's delay claim. *See Westerhold,* 28 Fed.Cl. at 175. The present facts distinguish this case from *Westerhold.*

Here, Jackson did not assert any contemporaneous delay and impact claims that were denied by the Government prior to the parties' execution of bilateral modifications for the waterline work or any of the other changes about which Jackson's witnesses testified at trial. Moreover, the Corps' letter dated October 31, 1994, is not, as Jackson contends, evidence of any subsequent negotiations between the parties. Rather, this letter merely acknowledges that the Corps received Jackson's delay claim and notified Jackson that its delay dispute was outside the scope of Modification No. P–00022. Thus, the Court rejects Jackson's argument that it had reserved its rights to assert a delay claim at a later date, as evidenced by the Corps' October 31 letter.

C. The releases in the bilateral modifications were neither ambiguous nor procured by misrepresentation.

The Court also rejects Jackson's argument that the release provisions were ambiguous and were procured through misrepresentation by the Corps. The Court finds no evidence in the record to support either of Jackson's assertions. At trial, Jackson failed to present evidence to support its contention that the release language was ambiguous. It also failed to present any specific evidence that the Corps had obtained releases through misrepresentation. According to Jackson, its strongest evidence of misrepresentation is Mr. Byrne's October 31 letter. As discussed in the previous section, Jackson's position appears to be based upon its own subjective interpretation of this letter. As the Court has already noted, Mr. Byrne's letter was intended to notify Jackson that its attempt to reserve its rights to assert delay claims arising from previously executed bilateral modifications was beyond the scope of Modification No. P–00022. *See* Joint Ex. 65/1. There is no evidence of misrepresentation by the Corps in this letter or elsewhere in the record. Jackson's position is unfounded.

D. The releases were not procured by duress.

 Finally, Jackson has failed to meet its burden of proving that the modifications were executed under duress. While an agreement may be voided if it was procured by duress, "a party must show more than mere financial harm or economic tension" to prove duress. *McLain,* 30 Fed.Cl. at 82. A party asserting economic duress must prove that: (1) its acceptance of the other party's terms was involuntary; (2) the circumstances permitted no alternative but to accept the terms; and (3) the acceptance resulted from the coercive acts of the other party. *See id.* at 83. Jackson cannot meet any of these elements, and its argument is thus unconvincing.

There is no evidence that the Corps acted coercively to obtain releases of Jackson's rights to assert future claims. Mr. Bordieri testified that the duress came in the form of economic pressure. He believed that Jackson would not be compensated for modifications unless it executed the modifications with the release language.

The Court does not find Jackson's bare assertions to be credible. Jackson did not even attempt to assert its right to additional claims until after the Contract had been com-

pleted, when Jackson inserted an after-the-fact reservation of rights into Modification Nos. P–00022 and P–00024. Mr. Bordieri's testimony regarding economic pressure is also contrary to the evidence because Jackson was paid for both of these modifications, even though Mr. Bordieri had inserted language that attempted to resurrect Jackson's rights to assert additional delay claims. Mr. Byrne's October 31 letter, which Jackson has touted as the strongest evidence in support of its position, explicitly refutes Jackson's claims of duress because this letter informs Jackson that its "modification is being processed * * *." Joint Ex. 65/1. Jackson offered no other evidence of duress, nor has Jackson explained why it had not complained of duress during its performance of the Contract.

In summary, Jackson has failed to muster any credible evidence of duress. Jackson's delay claim under Count I and its cumulative impact claim under Count II are both barred by the doctrine of accord and satisfaction. Moreover, for the reasons discussed below, Jackson failed to meet its burden of proving either of its claims on the merits.

II. Jackson's early completion delay claim seeking damages for unabsorbed home office overhead has no merit.

Although Jackson presented evidence at trial that described several problems that it had encountered during the course of the project, Jackson's early completion delay claim appears to be based solely upon the problems that it encountered in relocating the 8–inch waterline outside of the footprint. See Pl.'s Post-trial Mem. at 3. Jackson's claim, which it submitted on September 8, 1994, asserts that this delay lasted from October 30, 1992, until February 25, 1992, a period of 120 days. See Joint Ex. 59A. Jackson's post-trial brief reiterates its contention that "[t]his early delay, occasioned by the redesign and relocation of the utilities, carried over a one hundred twenty (120) day period from late October of 1992 through March of 1993." Pl.'s Post-trial Mem. at 3.

■■■ Using this period of delay, Jackson utilized the Eichleay formula to calculate its damages as follows:

1. (Contract Billings/Total Company Billings for Contract Period) × (Total Overhead for Contract Period) = Overhead Allocable to Contract.

2. (Overhead Allocable to Contract)/(Days of Contract Performance) = Daily Contract Overhead

3. (Daily Contract Overhead) × (Number of Days of Delay on Contract) = Recoverable Overhead.

1. $(3,228,198/9,842,477) \times (1,809,518) = 593,522$
2. $(593,522/260) = 2,283$
3. $(2,283 \times 86) = \$196,338$

See Joint Ex. 59A at 59/2–59/3. While Eichleay damages are recoverable when a contractor incurs additional home office overhead as a result of Government-caused delays, Jackson has failed to meet its burden of proof and thus cannot recover any damages under Count I.

A. A contractor's burden of proof on an Eichleay claim for unabsorbed home office overhead

■■■ When the Government delays or suspends work on a contract for an indefinite period of time, the contractor may be entitled to damages for the additional time of performance caused by the delay. See, e.g., P.J. Dick, Inc. v. Principi, 324 F.3d 1364, 1370 (Fed.Cir.2003). One category of recoverable delay damages is unabsorbed home office overhead; these damages are measured using a mathematical calculation known as the Eichleay formula. See id. A contractor incurs unabsorbed home office overhead when: (1) its stream of income on a contract is reduced because its progress has been hampered by a Government-caused delay of indefinite duration; and (2) the contractor is unable to secure comparable replacement work during the impacted period. See id. at 1375; see also Interstate Gen. Gov't Contractors, Inc. v. West, 12 F.3d 1053, 1058 (Fed. Cir.1993).

1. The purpose of awarding Eichleay damages

■■■ The purpose of awarding home office overhead damages is to compensate the contractor for those time-related general and administrative costs that it incurs to stay in

business, *i.e.*, costs that a contractor cannot simply reduce or eliminate during periods of inactivity on a construction project. *See Interstate*, 12 F.3d at 1058. Typical home office overhead costs include salaries of upper-level management, home office rent, general taxes and insurance, accounting and payroll costs, maintenance and utilities, depreciation, and other fixed costs that are necessary to manage a business. *See id.; see also Melka Marine, Inc. v. United States*, 187 F.3d 1370, 1375 (Fed.Cir.1999). Every contractor relies on receiving a steady stream of income from its various contracts not only to cover the direct costs associated with those contracts but also to cover its overhead costs. If the Government disrupts the contractor's stream of income on a contract and the contractor cannot find replacement work, then the Government is liable for the contractor's lost overhead.

### 2. Calculating unabsorbed home office overhead damages using the Eichleay formula

The Eichleay formula is used in construction cases to calculate a contractor's unabsorbed home office overhead damages. *See P.J. Dick*, 324 F.3d at 1370. In order to substantiate an Eichleay claim, a contractor must establish both the amount of its daily contract overhead and the number of days of delay, and then it must multiply those numbers to arrive at a damages calculation:

1. (Contract Billings/Total Company Billings for Contract Period) × (Total Overhead for Contract Period) = Overhead Allocable to Contract.
2. (Overhead Allocable to Contract)/(Days of Contract Performance) = Daily Contract Overhead
3. (Daily Contract Overhead) × (Number of Days of Delay on Contract) = Amount claimed.

*See Eichleay Corp.*, ASBCA No. 5183, 60–2 BCA ¶ 2688 at 13,568, 1960 WL 358 (1960). Thus, in order to substantiate an Eichleay claim, the contractor must first offer competent evidence to prove the correct amount of its contract billings, company billings, and total overhead for the contract period in order to arrive at an accurate amount for its

daily contract overhead. *See id.; accord Melka Marine*, 187 F.3d at 1374, n. 3.

■ While most contractors maintain cost records that allow them to determine the correct amount of daily contract overhead, contractors cannot recover Eichleay damages unless they also provide the Court with a basis for quantifying the number of days of delay. *See id.* As with any other delay claim, a contractor cannot recover damages for delays unless it proves by a preponderance of the evidence: (1) the number of days of delay attributable to the defendant's wrongful actions; and (2) that these delays were on the project's critical path. *See, e.g., Commercial Contractors, Inc. v. United States*, 29 Fed.Cl. 654, 662 (1993) (quoting *Youngdale & Sons Constr. Co. v. United States*, 27 Fed.Cl. 516, 550 (1993)). Although the plaintiff is not required to present a detailed critical path analysis, the plaintiff must provide the Court with some basis upon which to quantify the delay. *See id.* "The mere allegation that delays caused work to be disrupted or performed out of sequence, or caused costs to be increased, will not satisfy plaintiff's burden of proof." *Id.* In addition, as discussed in the next two sections, the contractor's burden of establishing its entitlement to delay damages becomes more difficult when the contractor is asserting an early completion delay claim.

### 3. The elements of proof for an Eichleay claim

In its most recent decision addressing Eichleay damages, the United States Court of Appeals for the Federal Circuit offered a six-part framework for this Court to follow in evaluating contractors' claims for unabsorbed home office overhead:

[A] court evaluating a contractor's claim for Eichleay damages should ask the following questions: (1) was there a government-caused delay that was not concurrent with another delay caused by some other source; (2) did the contractor demonstrate that it incurred additional overhead (*i.e.*, was the original time frame for completion extended or did the contractor satisfy the *Interstate* three-part test [for establishing an early completion delay claim]); (3) did

the Government CO issue a suspension or other order expressly putting the contractor on standby; (4) if not, can the contractor prove there was a delay of indefinite duration during which it could not bill substantial amounts of work on the contract *and* at the end of which it was required to be able to return to work on the contract at full speed and *immediately;* (5) can the government satisfy its burden of production showing that it was not impractical for the contractor to take replacement work (*i.e.,* a new contract) and thereby mitigate its damages; and (6) if the government meets its burden of production, can the contractor satisfy its burden of persuasion that it was impractical for it to obtain sufficient replacement work.

*P.J. Dick,* 324 F.3d at 1373. If the contractor meets these requirements, then it is entitled to recover unabsorbed home office overhead using the Eichleay formula. *See id.*

4. Additional requirements for the recovery of Eichleay damages when a contractor is asserting an early completion theory

■ As the Federal Circuit indicated in the second of its six questions, a contractor faces an additional hurdle when it attempts to recover unabsorbed home office overhead on a contract that was completed within the contract's original deadline. *See P.J. Dick,* 324 F.3d at 1373. In such circumstances, the Federal Circuit cautioned that the contractor must "demonstrate that it incurred additional overhead" by satisfying "the *Interstate* three-part test" for establishing an early completion delay claim. *Id.* Under this test, a contractor that finishes a project on time (or early) despite Government-caused delays can recover unabsorbed home office overhead on an early completion delay claim only if it proves: (1) that it intended to finish early; (2) that it was capable of finishing early; and (3) that it would have actually finished early but for the Government's actions. *See Interstate,* 12 F.3d at 1059; *accord Wickham Contracting Co. v. Fischer,* 12 F.3d 1574, 1582 (Fed.Cir.1994); *Weaver–Bailey Contractors, Inc. v. United States,* 19 Cl.Ct. 474, 479 (1990), and *order granting attorney's fees,* 24 Cl.Ct. 576 (1991).

The contractor is not required to notify the Government of its intent to finish early as " '[i]t would seem to make little difference whether or not the parties contemplated an early completion * * *.' " *Wickham,* 12 F.3d at 1582 (quoting *Metropolitan Paving Co. v. United States,* 163 Ct.Cl. 420, 423, 325 F.2d 241, 242–43 (1963)); *accord Weaver–Bailey,* 24 Cl.Ct. at 578–79. The record, however, must contain concrete evidence of the contractor's intent, such as a bid, estimate, or any other contemporaneous documentation of its planned early completion. *Wickham,* 12 F.3d at 1582. Notice to the Government, while not required, may be sufficient evidence of intent. *See id.*

Even if a contractor can demonstrate its intent to finish early, then it must still prove that it could have and would have finished early. *See Interstate,* 12 F.3d at 1059; *accord Wickham,* 12 F.3d at 1582; *Weaver–Bailey,* 19 Cl.Ct. at 479, and *order granting attorney's fees,* 24 Cl.Ct. 576. The contractor must prove that it had the technical capacity to complete the job ahead of schedule, had a viable work schedule to do so, and would have achieved early completion if not for the Government-caused delays. *See Wickham,* 12 F.3d at 1574.

Utilizing this framework, the Court now analyzes Jackson's Eichleay claim and finds that Jackson failed to meet its burden of proof in several respects. First, Jackson did not substantiate its claim that the Contract was delayed by 120 days, and its failure of proof left the Court without any basis to quantify the actual number of days of delay to the project's critical path. Second, even if Jackson had demonstrated a delay to the Contract's critical path, its claim would still fail because Jackson calculated its Eichleay damages using incorrect data that unjustifiably inflated the amount of its daily Contract overhead. Jackson's failure of proof left the Court without any basis to ascertain the correct amount of Jackson's daily contract overhead. Third, leaving aside Jackson's flawed calculation of Eichleay damages, Jackson also failed to establish a valid early completion delay claim under the *Interstate* three-part test.

B. Jackson failed to meet its burden of proof on its early completion delay claim for Eichleay damages under Count I.

1. Jackson failed to prove the exact number of days of delay to the project's critical path.

■ At trial, Jackson failed to introduce any specific evidence to support its assertion of a 120–day delay to the Contract arising from the difficulties in the waterline relocation or from any of the other problems that it encountered during the project. Before the Court can award Eichleay damages for unabsorbed home office overhead, the contractor must prove that the Government caused a delay, and the contractor must quantify the number of days of delay to the project's critical path. *See, e.g., Commercial Contractors, Inc.,* 29 Fed.Cl. at 662 (quoting *Youngdale & Sons Constr. Co. v. United States,* 27 Fed.Cl. 516, 550 (1993)). The contractor must do more than allege that its work was delayed by the Government's disruptions or changes—it must present specific evidence of which activities were delayed and how those delays extended the duration of the contract. *See id.* Jackson failed to substantiate its claim that the problems it encountered in performing the waterline relocation (or any other activities, for that matter) delayed the critical path by 120 days. Further, Jackson's failure of proof left the Court without any basis upon which to ascertain the exact number of days of delay to the Contract.

It does appear from the testimony of Jackson's witnesses, the project's daily reports, and from Jackson's pay estimates that the work progressed slowly for some period of time following Jackson's receipt of the notice to proceed on October 26, 1992. It also appears that Jackson performed little work, except minor tasks, until sometime during the middle of December 1992, when excavation work began in earnest. A contractor's performance of minor tasks during a delay period would not preclude the Court from awarding Eichleay damages for that period. *See Altmayer v. Johnson,* 79 F.3d 1129, 1134

(Fed.Cir.1996). If presented with specific evidence, the Court may have been able to ascertain some period of time during which Jackson was on standby.[5]

The flaw in Jackson's *prima facie* case, however, is that it claimed a delay of 120 days as a result of the waterline relocation problem, *see* Pl.'s Post-trial Mem. at 3, but it failed to substantiate a delay to the critical path of this magnitude. Jackson's claim, which it submitted on September 8, 1994, asserts that the waterline delay lasted from October 30, 1992, until February 25, 1993, a period of 120 days. *See* Joint Ex. 59A. At trial, however, Jackson failed to present any critical path analysis or other justification for why it measured the delay using these two dates. Nor did Jackson provide the Court with sufficient evidence to enable the Court to reconstruct the project's critical path.

Moreover, Jackson's own documentation indicates that the waterline delay could not have lasted more than 82 calendar days. According to Jackson's in-house schedule, the waterline relocation should have finished on November 16, 1992. *See* Pl.'s Ex. 4. Instead, according to the testimony of Jackson's superintendent, this work was completed on February 6, 1993, 82 days later. Therefore, even if Jackson were entitled to recover delay damages for the period of time in which its waterline relocation work was delayed, its claim would be for no more than 82 days— not the 120 days claimed by Jackson. The Court, however, cannot find that Jackson is entitled to 82 days of delay because Jackson offered no evidence to prove that these delays were all caused by the waterline problems or that they impacted the project's critical path.

While it is clear that Jackson overstated the length of the alleged waterline delay using its own methodology, Jackson's claim also fails because it used the wrong methodology for measuring the number of days of delay. The delay claim that Jackson presented at trial is based upon its in-house schedule, which showed early completion. *See* Pl.'s Ex. 4. Relying upon its in-house

---

5. As discussed *infra,* however, any such standby time would not have been compensable because Jackson ultimately completed the Contract on

schedule and failed to prove its early completion claim.

schedule, Jackson claimed at trial that it had planned to finish the Contract on December 30, 1993, the finish date set forth in that schedule. Instead, Jackson actually completed the Contract on March 30, 1994, as mandated by the Contract. Thus, even if Jackson could otherwise prove the elements of an early completion delay claim, the delay would be measured by the difference between its planned early finish date (December 30, 1993) and its actual finish date (March 30, 1994), a time period of 90 calendar days. In order to satisfy its burden of proof, Jackson would also have to prove that the Corps was solely responsible for all 90 days of delay.

The Court need not rely solely upon Jackson's failure to substantiate and quantify the length of delay because Jackson also utilized erroneous data in calculating the daily Contract overhead portion of its Eichleay claim. Furthermore, Jackson failed to meet its burden of proving an early completion delay claim because it did not demonstrate that: (1) it intended to utilize the in-house schedule; (2) that it could have finished the Contract in accordance with that schedule; and (3) that it would have done so if not for the Corps' delays.

### 2. Jackson incorrectly calculated the daily Contract overhead portion of its Eichleay calculation.

Not only did Jackson fail to prove the exact number of days of delay to the Contract's critical path, but it also failed to meet its burden of proving the correct amount of daily Contract overhead to be used in its Eichleay calculation. Jackson calculated its Eichleay damages using the following formula:

1. (Contract Billings / Total Company Billings for Contract Period) × (Total Overhead for Contract Period) = Overhead Allocable to Contract.

2. (Overhead Allocable to Contract) / (Days of Contract Performance) = Daily Contract Overhead

3. (Daily Contract Overhead) × (Number of Days of Delay on Contract) = Recoverable Overhead.

1. $(3,228,198/9,842,477) \times (1,809,518) = 593,522$
2. $(593,522/260) = 2,283$
3. $(2,283 \times 86) = \$196,338$

*See* Joint Ex. 59A at 59/2, 59/3. As the defendant demonstrated at trial, Jackson's Eichleay claim is riddled with errors and incomplete information. First, Jackson erroneously calculated the days of contract performance using work days instead of calendar days. *Id.* This error would substantially reduce Jackson's claim, but the Court would still have a basis to recalculate these damages because the parties stipulated that there were 520 calendar days of Contract performance. The Court, however, cannot merely substitute 520 days into the formula and recalculate Jackson's claimed damages because Jackson also failed to utilize complete and accurate financial data in calculating its claim.

Jackson misstated its total billings for the Contract period. On cross-examination, Mr. Bordieri admitted that Jackson's total billings far exceeded $9,842,477, the value used in its Eichleay claim. Mr. Bordieri admitted that this figure only accounted for that portion of Jackson's contracts in progress as of January 31, 1994, and did not include its total billings for the full 520 days of Contract performance. While Mr. Bordieri attempted to correct this accounting mistake at trial by testifying that his total billings for the entire Contract period were $35,593,333, Jackson failed to introduce any documentary evidence to support Mr. Bordieri's assertion. Accordingly, the Court was left without any competent evidence of Jackson's total billings for the Contract period. Lacking this evidence, the Court would be unable to award any Eichleay damages to Jackson, regardless of whether or not it otherwise proved its claim.[6]

In sum, Jackson's Eichleay calculation improperly inflated its damages for unabsorbed home office overhead, and the lack of evidence of its actual billings during the Contract period leaves the Court with no basis

---

**6.** Jackson also understated its Contract billings, which, by Jackson's own admission, exceeded $4 million. Jackson's Eichleay calculation utilized a much lower figure, $3,228,198, for its Contract billings. While this mathematical error is theoretically correctable, Jackson's failure to provide the Court with evidence of the actual amount of its total company billings for the Contract period leaves the Court with no basis upon which to measure its Eichleay damages.

upon which to determine the correct daily overhead rate. Moreover, leaving aside Jackson's erroneous quantification of its claim, Jackson also has not met its burden of proving that it is entitled to recover delay damages under an early completion theory.

### 3. Jackson failed to prove the three elements of an early completion claim under the *Interstate* test.

■■■ The Court also finds a lack of evidence to support Jackson's assertion that it was delayed in completing the Contract under an early completion theory. According to the Federal Circuit, a contractor can recover Eichleay damages under an early completion theory only if it can "demonstrate that it incurred additional overhead" by satisfying "the *Interstate* three-part test" for establishing an early completion delay claim. *See P.J. Dick*, 324 F.3d at 1373. As discussed above, this three-part test requires the contractor to prove: (1) that it intended to finish early; (2) that it was capable of finishing early; and (3) that it would have actually finished early but for the Government's actions. *See Interstate*, 12 F.3d at 1059; *accord Wickham*, 12 F.3d at 1582; *Weaver–Bailey*, 19 Cl.Ct. at 479. Even if Jackson had met its burden of quantifying its Eichleay claim, it still would not be entitled to recover delay damages because the Court finds insufficient evidence in the record to support Jackson's position.

First, Jackson offered scant evidence to prove that it had intended to finish the Contract using its in-house early completion schedule rather than the official schedule. The only evidence offered by Jackson was the testimony of Mr. Sullivan and Mr. Bordieri, both of whom asserted that Jackson always worked through the winters in New Hampshire. These self-serving statements are of little probative value without any documentary evidence of Jackson's intent to finish early on this Contract. Jackson failed to produce a copy of either its estimate, bid, or any other document that would show whether it originally planned to utilize the 17–month schedule that it provided to the Corps or the 14–month schedule that Jackson maintained internally. Nor could either of Jackson's witnesses recall if Jackson had provided a copy of its early completion schedule to the Corps. While notice·to the Government is not a prerequisite to proving intent, any such transmittal would have been compelling evidence of Jackson's intent to finish the project early.

In this case, Jackson failed to notify the Corps of its intent to finish early, and it otherwise failed to provide objective evidence of its purported intent to complete the Contract in accordance with its in-house (early completion) schedule. At trial, Jackson's witnesses asserted that it had always intended to manage the project using the in-house schedule. According to Jackson, the official schedule was merely intended to show the length of the waterline relocation delays by showing a gap in activities that ran from approximately mid-December 1993 through mid-March 1994. The Court does not find this assertion to be credible for several reasons. First, the official schedule, like Jackson's in-house schedule, shows that Jackson planned to complete the utility work and bulk excavation in November and December 1992, *prior* to the three-month shutdown. *See* Pl.'s Ex. 6A. Second, Jackson did not label this shutdown period as a delay on the schedule. Nor did Jackson inform the Corps that this shutdown period on the schedule represented a delay caused by the waterline relocation work (rather than as a result of the winter weather). Third, Jackson's claim for additional costs arising from the waterline work, dated March 9, 1993, does not request a time extension or any additional compensation for delays. If the gap in the official schedule had actually represented the length of delay, the Court expects that Jackson would have raised this point in its waterline claim.

Therefore, Jackson's silence, under the circumstances, leaves the Court skeptical of Jackson's assertion that the shutdown period on the official schedule is a measure of the delays arising from the waterline relocation work. This case is analogous to those in which our Supreme Court has rejected claims that Congress intended for its legislation to be interpreted in a manner that was neither explicit in the statutory language nor anywhere in the legislative history. In one such case, the Supreme Court likened the

lack of evidence supporting a given interpretation to "the dog that did not bark" in the famous Sherlock Holmes story. *See Chisom v. Roemer,* 501 U.S. 380, 395–96, n. 23, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (citing A. Doyle, *Silver Blaze,* in *The Complete Sherlock Holmes* 335 (1927)) (drawing a negative inference of congressional intent from the lack of any explicit reference in the statute or evidence in the legislative history to support the claimed congressional intent). That is, in certain instances, silence can be compelling evidence. In this case, Jackson's silence is evidence of a *lack* of intent to finish early. Jackson could have proven its intent to finish early in a number of ways, but it failed to provide any such evidence. Jackson did not notify the Corps of either its intent to finish early or even the existence of its in-house schedule. Jackson also failed to identify the shutdown period in its official schedule as a delay, and it did not contemporaneously seek a time extension or delay damages in its waterline claim. Furthermore, Jackson has failed to provide any contemporaneous evidence of its purported intent to finish early using the in-house schedule. The Court, therefore, draws a negative inference from the fact that the "dog * * * did not bark" and finds that Jackson never intended to complete the Contract in accordance with its in-house (early completion) schedule. *See id.*

Second, Jackson failed to prove that it could have finished the project early and that it would have done so but for the Corps' delays. The Court finds that Jackson's in-house schedule was not a realistic plan for early completion. Jackson created this schedule on October 26, 1992, the first day of the project. *See* Pl.'s Ex. 4. This schedule showed waterline relocation work starting on November 2, 1992, and finishing fourteen days later. *See id.* By the time the Contract began, however, it had already become apparent to Jackson that the waterline's location in the footprint was going to be a problem. Yet, this in-house schedule allowed for very little time in which to gain the necessary approvals and to coordinate the work with its subcontractors.

The evidence in the record reveals that Jackson was not prepared to move forward with its aggressive in-house schedule. Mr. Sullivan, who was responsible for supervising the work, did not even get involved in the project until the end of October 1992. At that time, he reviewed a draft schedule that was nearly identical to Jackson's in-house schedule and expressed his doubt that this schedule was realistic. Mr. Sullivan, an experienced superintendent, commented that he needed more time and would have had trouble making the early completion schedule work.

In addition, Mr. Sullivan acknowledged that Jackson was not ready to begin the waterline work on November 2, 1992, as required by the in-house schedule. Mr. Sullivan testified that his initial duties at the site in late October and early November involved mobilizing and negotiating with subcontractors. According to his own daily reports, no physical work began at the site until after November 23. Furthermore, while Mr. Sullivan had been notified by Jackson's estimator that the waterline's location in the footprint was going to pose a problem, he admitted that, at the start of the Contract, he had "not a clue" about how best to proceed with the waterline relocation work. Tr. at 223. It appears that what Mr. Sullivan meant by that remark was that he needed to analyze the waterline issue with his coworkers and Jackson's subcontractors in order to determine whether to leave the waterline running through the TIA Center's footprint (as was shown on the plans and specifications) or to relocate the waterline outside of the footprint. Thus, Jackson would not have been prepared to begin the work on November 2nd, even if it had decided to move forward and excavate around the waterline as per the plans and specifications.

While Mr. Sullivan is to be credited for working with his subcontractors to devise a successful plan to permanently relocate the waterline outside of the TIA Center's footprint, Jackson should have known that its schedule for performing this work between November 2nd and November 16th was unrealistic. In fact, Jackson was still attempting to procure a subcontractor for the waterline work after November 16, 1992, which was the finish date for this work, according

to the in-house schedule. The proposal for waterline relocation that Jackson ultimately accepted was dated November 19, 1992. Jackson did not even discuss its waterline relocation proposal with the Corps until December 4, 1992, and it did not submit a formal shop drawing for this work until December 22, 1992. The Corps approved Jackson's waterline relocation plan on December 28, 1992, and Jackson accomplished the relocation by February 6, 1993.

The actual timeframe in which Jackson accomplished the utility work and excavation was more realistic than the plan set forth in Jackson's in-house schedule. By Jackson's own admission, the primary purpose of its in-house schedule was to manage the progress of its subcontractors in an attempt to push them to stay ahead of schedule. *See* Tr. at 221 While Jackson's official schedule similarly showed utility work taking place in November 1992, this schedule also provided sufficient float time for Jackson to mobilize at the site, negotiate with its subcontractors, and obtain all of the necessary approvals to relocate the waterline outside of the TIA Center's footprint. Jackson's in-house schedule, on the other hand, did not present a realistic plan for completion of the work. Therefore, Jackson has no grounds to assert an early completion delay claim premised upon its in-house schedule.

### III. Jackson's total cost claim has no merit.

Under Count II of its Complaint, Jackson sought $135,078 in additional damages resulting from "the cumulative impact of th[e] numerous changes" required by the Corps during the course of the Contract. Joint Ex. 59/1. According to Jackson, the Corps issued hundreds of changes, which resulted in 24 bilateral modifications that increased the Contract price by $618,189. Although Jackson concedes that it received payment for all of these changes and even made a profit on the Contract, Jackson now argues that it is entitled to impact damages for "the delay caused by these inordinate changes, alone." Pl.'s Post-trial Mem. at 27–28.

Jackson utilized the total cost method to calculate its damages under Count II. Jackson has argued that the vast number of

changes made it impossible to itemize and isolate the impact arising from each individual change. Moreover, according to Jackson, the complex nature of construction "make[s] it impossible to delineate with time clock accuracy each delay in the production of a construction project." Pl.'s Post-trial Mem. at 29. Jackson's initial total cost claim, submitted on September 8, 1994, did not explain how it calculated its damages of $135,078. *See* Joint Ex. 59/1. On October 7, 1994, Jackson submitted a more detailed calculation of its damages:

| Actual Performance Costs | | |
|---|---|---|
| Labor | $276,616.94 | |
| Material | 434,420.39 | |
| Total | | $711,037.33 |
| | | |
| Contract Bid Costs | | |
| Labor | 255,340.00 | |
| Material | 320,619.00 | |
| Total | | (575,959.00) |
| | Cost Overruns | $135,078.33 |

Pl.'s Ex. 35.

Jackson's cumulative impact claim, calculated by using the total cost method, does not merit serious consideration. Jackson failed to prove any of the prerequisites for asserting a cumulative impact claim. Furthermore, Jackson's total cost claim is improperly calculated. At trial, Jackson conceded that it made a profit on the Contract. Therefore, if Jackson had properly calculated its total cost claim, then it would have found that it incurred no total cost damages on the Contract.

### A. Jackson failed to prove its cumulative impact claim.

At trial, Jackson did not meet its burden of proving that it incurred additional damages resulting from the cumulative impact of the numerous changes to the Contract. Any contractor seeking an equitable adjustment from the Government must prove liability, causation, and resultant injury. *See Servidone Constr. Corp. v. United States,* 931 F.2d 860, 861 (Fed.Cir.1991). An impact claim—often characterized using other names, such as, "cumulative impact," "ripple effect," "loss of labor efficiency," or "loss of productivity"—is based upon the theory that

individual compensable changes to a Contract, taken as a whole, can have such a disruptive effect on the contractor's performance that the contractor has a compensable claim for costs in addition to the amounts of its individual change orders. *See, e.g., McMillin Bros. Constr., Inc.,* EBCA No. 328–10–84, 91–1 BCA ¶ 23,351 at 117,102–05, 1990 WL 140900 (1990), *aff'd* 949 F.2d 403 (Fed.Cir.1991); *see also J.A. Jones Constr. Co.,* ENGBCA Nos. 6348, 6386–6391, 00–2 BCA ¶ 31,000 at 153,107, 2000 WL 1014011 (2000); *Bechtel Nat'l, Inc.,* NASA BCA No. 1186–7, 90–1 BCA ¶ 22549 at 113,177–78, 1989 WL 160470 (1989).

In order to recover on an impact claim, a contractor must do more than present evidence of the sheer number or scope of changes. *See id.* Nor is it sufficient to compare the cost of the work, as changed, to the original contract price. *See id.* A contractor must also present evidence of causation and impact. *See id.* Cumulative impact claims are fact-intensive and require the contractor to substantiate its claims that its work was delayed or was performed in an inefficient, unproductive, or more costly manner as a result of the individual changes to the Contract. *See id.* As one board observed, "[t]here must be testimony and contemporaneous documents evidencing the type and extent of disruption to the work, and a showing that the disruption resulted from Government actions." *McMillin,* 91–1 BCA at 117,105.

■ In this case, Jackson failed to prove either causation or injury. While the Corps issued many changes during the course of the work, Jackson relied solely upon the sheer number and dollar value of these changes to substantiate its impact claim. Jackson presented no evidence to support its assertion that it incurred additional costs beyond the compensation that it had already received for these changes in bilateral modifications. The Court heard no specific evidence as to how its work was disrupted or performed inefficiently as a result of the cumulative impact of these changes. Indeed, Jackson's damages calculation seems to belie its allegation of a cumulative impact. Jackson's damages claim of $135,078.33 consists

of a $113,801.39 overrun in materials and only a $21,276.94 overrun in labor costs. Typically, impact claims arise from an increase in labor costs because the contractor is required to expend additional man-hours to implement the changes into its overall work plan. Jackson failed to explain how this disparity in its materials overruns was caused by the inordinate number of changes during the Contract. In short, Jackson has failed to prove any impact that caused it to incur additional costs for which it has not already received compensation.

B. Jackson improperly calculated its claim using the total cost method.

■ Even if Jackson could establish a cumulative impact claim, Jackson improperly resorted to the total cost method to calculate its damages and incorrectly applied this methodology. The total cost method measures the difference between a contractor's total actual costs incurred in performing a contract and the amount of the contractor's bid for the contract. *See Youngdale,* 27 Fed. Cl. at 541. The Federal Circuit is generally skeptical of the total cost method because that method assumes that a contractor is not responsible for any bidding inaccuracies or performance inefficiencies. *See Servidone,* 931 F.2d at 861–62. Therefore, a contractor can recover damages under the total cost method only if it can show that: (1) it was impracticable to prove actual losses directly; (2) its bid was reasonable; (3) its actual costs incurred were reasonable; and (4) it was not responsible for any of the additional costs that it incurred. *See id.* at 861.

■ Jackson failed to meet its burden of proving any of these four elements. Most notably, Jackson did not prove that its work was disrupted by the multitude of changes, and it did not prove that it was impracticable to quantify the losses resulting from this disruption. If Jackson had attempted to quantify its purported losses, it would have seen that it did not lose money on the Contract. It appears that Jackson made no effort to identify the impacts or to quantify the actual losses arising therefrom, even though it utilized a sophisticated, computerized cost accounting system to manage the Contract.

Moreover, Jackson offered no evidence to prove that it was not responsible for any added costs on the Contract. For these reasons alone, Jackson's total cost claim must be rejected.

Jackson's total cost claim must also be rejected because it is not properly calculated. In presenting its claim at trial, Jackson did not subtract the amount of its bid from the amount of its actual costs, as is required under the total cost method. If it had performed this calculation correctly, it appears that Jackson would have incurred no damages because its total costs were actually less than its bid estimate. In fact, Mr. Bordieri testified that Jackson actually made a profit of approximately $220,000 on the Contract. Therefore, if Jackson had properly calculated its damages under the total cost method, it would have shown a profit—not a loss—on the Contract.[7]

In sum, the total cost claim that Jackson presented at trial is unreliable and appears to have been manipulated in an attempt to create a financial loss on the Contract. Rather than using its actual bid amount and its actual costs, Jackson broke down its claim into separate components for labor and materials. This erroneous methodology accounts for the "loss" that Jackson claimed on a Contract under which it actually made a profit. In calculating the separate labor and materials components of its total cost claim, Jackson conceded that it recategorized certain costs in its bid in order to reduce the amounts that it claimed to be its bid amounts for labor and materials. For example, Mr. Bordieri admitted that Jackson had deleted $198,912 from its initial bid estimate and recategorized this cost as a purchasing efficiency. Thus, Jackson inflated its total cost calculation by at least $198,912. If this amount had been included in Jackson's total cost calculation, then Jackson would have shown a net gain rather than a net loss on the Contract. Mr. Bordieri also admitted that Jackson had removed $323,792 in profit

from its bid amount before performing the total cost calculation. This, too, had the effect of manufacturing a net loss out of a Contract on which Jackson made a profit. Jackson's erroneous total cost calculation provides the Court with an additional reason to reject Jackson's cumulative impact claim under Count II.

In final summary, Jackson is not entitled to any damages under either Count I or Count II. Both Jackson's delay claim and its cumulative impact claim are barred by the doctrine of accord and satisfaction because Jackson executed bilateral modifications that included blanket releases, and Jackson did not timely reserve its rights to assert additional claims. In addition, Jackson failed to prove either claim on the merits. On Count I, Jackson did not meet its burden of proving the existence and extent of a compensable delay, nor did it prove entitlement to Eichleay damages under an early completion theory. On Count II, Jackson did not meet its burden of proving the existence of a cumulative impact claim, nor did it prove entitlement to damages under a total cost theory. Accordingly, judgment must be entered on behalf of the defendant on both Count I and Count II of Jackson's Complaint.[8]

## CONCLUSION

Based upon the Court's consideration of the entire record presented at trial, the Court concludes that the defendant prevails in this action. The plaintiff has failed to prove that it is entitled to any recovery under Count I and Count II of the plaintiff's Complaint.

The Clerk of the Court shall enter judgment for the defendant and dismiss the Complaint in its entirety.

Each party is to bear its own costs.

---

7. The Court is unable to verify the exact amount of Jackson's profit on the Contract because the job cost report upon which Jackson relied at trial, which was dated September 6, 1994, was not its final job cost report for the Contract. *See* Pl.'s Ex. 47. This job cost report contained several estimates for expected profit as well as cost allowances for a small portion of unfinished

work. Jackson's failure to prove its actual costs provides the Court with another reason to reject Jackson's total cost claim.

8. Judgment was entered on June 26, 1997, dismissing Count III of the plaintiff's Complaint.